**Richard E. HAAS et al., Appellants,**

v.

**GULF COAST NATURAL GAS COMPANY, Appellee.**

**No. 718.**

Court of Civil Appeals of Texas, Corpus Christi.

July 31, 1972.

Rehearing Denied Sept. 7, 1972.

Archer Parr, San Diego, John J. Pichinson, Corpus Christi, for appellants.

J. W. Cooper, Jr., Corpus Christi, for appellee.

OPINION

BISSETT, Justice.

This is a suit to recover the pro-rata costs of drilling a dry hole. Gulf Coast Natural Gas Company, plaintiff, sued Richard E. Haas, Joe Buford, Flournoy Drilling Company, Dr. John J. Sloan, Madeline C. Sloan and Dr. June Yates, defendants, to recover from each of them their proportionate share of the cost of drilling a dry hole in search of oil or gas on lands covered by an oil, gas and mineral lease.

Upon a non-jury trial, judgment was entered that plaintiff recover $6,093.90 against each of the defendants Richard E. Haas, Joe Buford and Flournoy Drilling Company; $2,030.98 against each of the

defendants Dr. John J. Sloan and Madeline C. Sloan; and $1,030.98 against the defendant Dr. June Yates. Defendants have duly perfected an appeal from the judgment rendered. We reverse and remand. The parties will be designated either by name or as they appeared in the trial court.

The parties jointly owned an oil, gas and mineral lease covering lands situated in Live Oak County, known as the Jarbeaux Lease. Plaintiff owned an undivided one-half interest therein; the defendants Richard E. Haas, Joe Buford and Flournoy Drilling Company each owned an undivided one-eighth interest therein; and the defendants Dr. John J. Sloan, Madeline C. Sloan and Dr. June Yates each owned an undivided one-twenty-fourth interest therein.

An operating agreement, dated February 2, 1970, was executed by all parties, wherein plaintiff was appointed operator for the jointly owned mineral lease. Section 15 thereof, in part, provided:

"All wells drilled on the Unit Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. . . ."

In early November, 1970, plaintiff asked Rhodes & Hicks Drilling Corporation, Alice, Texas, for a "turnkey" bid on the drilling of a well to a depth of 4500 feet on the subject lease. A written bid was submitted on November 9, 1970, whereby Rhodes & Hicks offered to dig the well to the required depth for $16,785.00. The bid specified that the contractor would provide the rig, labor, fuel, water and bits and would also stake the well, clean the location and build the roads required up to $300.00, furnish surface casing and cement it in the hole, supply mud and chemicals, run an electrical induction log, and plug the well and backfill the pits if the well was dry.

Mr. Paul Cameron, a consulting petroleum engineer, Houston, Texas, was hired by plaintiff to supervise the drilling of the well.

He prepared an estimate of the cost, which was based on the bid submitted by Rhodes & Hicks. Whereupon, plaintiff, pursuant to the appropriate provisions contained in the operating agreement, mailed a letter to each defendant on November 17, 1970, wherein each was advised that plaintiff proposed to drill a well on the Jarbeaux Lease to a depth of 4500 feet to test the Frio Sands. Attached to the letter were two copies of the cost estimate, denominated "Authority For Expenditure", hereinafter referred to as "AFE", prepared by Mr. Cameron for distribution to defendants. The costs of drilling the well and plugging and abandoning the same if the well was dry, including (a) the cost of obtaining a drilling rig and equipment, and (b) third party costs for services, equipment rentals, materials and supplies incidental and necessary to the proposed drilling operations were estimated to be:

| | |
|---|---|
| (a) Drilling costs, which specified footage drilled @ $2.05 per foot (2.05 x 4500), and two days rig time (one day @ $1,100.00 with drill pipe and one day @ $1,050.00 without drill pipe), totalling | $11,375.00 |
| (b) Third party costs, totalling | 12,050.00 |
| Total | $23,425.00 |

All parties desiring to participate in the drilling of the well were requested to "so signify by signing and returning one copy of the AFE". Each defendant promptly signed a copy thereof and returned same to plaintiff.

Mr. Cameron, under the direction of plaintiff, contacted more than thirty drilling contractors in an effort to secure a drilling rig for the drilling of the well. In addition to the Rhodes & Hicks bid that was received by plaintiff on November 9, 1970, or shortly thereafter, plaintiff received the following written bids:

(a) Valley Well Service, Inc., Corpus Christi, Texas, dated December 2, 1970, in the amount of $25,503.00, which included the drilling of the well to 4500 feet and the furnishing of substantially the identical

third party services that Rhodes & Hicks agreed to furnish;

(b) Frio Drilling, Inc., Corpus Christi, Texas, dated December 3, 1970, @ $3.85 per foot with no third party services to be furnished by it, except free rig time to run surface casing and to plug and abandon;

(c) Bill Pearl Drilling Co., Alice, Texas, dated December 24, 1970, in the amount of $15,400.00, which included the drilling of the well to 4500 feet and the furnishing of substantially the same third party services set out in the bid by Rhodes & Hicks.

Mr. Cameron testified that of all the drilling contractors contacted by him, only Stewart Well Service, Houston, Texas, had a rig available for drilling during the latter part of December, 1970. The record does not set out the details of the discussion had between Mr. Cameron and a representative of Stewart Well Service; however, it is established that Mr. Cameron prepared a cost estimate based on such discussion. He estimated that the well could be drilled in eight days. He allocated $9,600.00 for rig time and $15,394.00 for third party costs, which included $3,000.00 for hauling the rig from Houston to the location and back to Houston, $1,691.00 for tool rentals, $753.-00 for bits, $1,500.00 for cementing, $800.00 for mud and chemicals, and $900.00 for hauling tools and water. This cost estimate was delivered to plaintiff. It was never submitted to the defendants.

On December 23, 1970, a drilling contract was entered into by and between plaintiff, as well owner, and by Stewart Well Service, as contractor. The well was to be drilled to 4500 feet or to the Frio Sand, whichever was reached first. The contractor was required to furnish, at its own cost, a crew of four and a complete drilling rig, the major items being draw works, engines, pumps, derrick or mast, and one blowout preventer. All other equipment, supplies, materials, fuel, mud, chemicals, trucking charges, equipment rentals and services were to be furnished by the owner of the well. Plaintiff agreed to pay the

drilling contractor on a day work basis at the rate of $1,200.00 per day for day work, with or without drill pipe. Drilling was commenced in December, 1970 and was completed in January, 1971. The well was dry. The cost of drilling, plugging and abandoning the well was $48,751.12; the actual drilling costs paid to the drilling contractor amounted to $20,787.30, and the other costs (third party costs) totalled $27,-963.82.

Each of the defendants, after demand made on them by plaintiff, refused to pay any part of the cost of drilling, plugging and abandoning the well with the exception of Dr. June Yates, who paid plaintiff the sum of $1,000.00.

Plaintiff filed suit against the defendants on July 1, 1971. It alleged that the well was drilled under the terms and provisions of the operating contract and was expressly authorized by the defendants by virtue of their signing and returning the AFE. Copies of the operating agreement, the AFE, and invoices totalling $48,751.12 in connection with the drilling of the well were attached to, incorporated in, and made a part of plaintiff's petition. Plaintiff averred that "by reason of the premises", each defendant became obligated to pay to plaintiff their pro-rata part of the actual cost incurred in the drilling, plugging and abandoning of the well.

The defendants, in their answer, in addition to denials, affirmatively plead that (a) the operating agreement and the AFE, properly construed, did not authorize plaintiff to drill the well in any manner other than that expressly provided in such instruments; (b) such instruments did not authorize the plaintiff to incur the expenses in drilling the well in the manner and in the amount in which they were incurred; (c) no agreement can be inferred that authorized the plaintiff to furnish the services and materials that were employed to drill the well; (d) the defendant received no benefit from the drilling of the well; and, (e) plaintiff breached the operating agreement.

Defendants, by their first two points of error, assert that the trial court erred in entering judgment for plaintiff "because the evidence wholly failed to prove that the well in question was drilled" (a) "on a competitive contract basis", and (b) "at the usual rates prevailing in the area where it was drilled".

The language used in the points leaves this Court in doubt as to whether defendants urge "no evidence" points, or "factually insufficient evidence" points. In resolving such doubt, we look not only to the points themselves, but also to the statements and arguments thereunder as well as to the prayer for relief. Defendants, in their brief, pray that the judgment of the trial court be reversed and rendered, that plaintiff take nothing, or, in the alternative, that the judgment be reversed and the cause remanded to the trial court for a new trial. Justice Calvert, in 38 Tex.L. Rev. 359, "No Evidence" and "Insufficient Evidence" Points of Error, at pages 359–360 said:

" . . . The controlling consideration with an appellate court in passing on a point of error directed at the state of the evidence is not whether the point uses the preferable, or even the proper, terminology, but is whether the point is based upon and related to a particular procedural step in the trial and appellate process and is a proper predicate for the relief sought. . . . "

We believe that the points lay a proper predicate for a new trial. Therefore, bearing in mind the distinctions made in the foregoing article between "no evidence" and "insufficient evidence" points and following the injunction of Rule 1, Texas Rules of Civil Procedure, that the Rules of Civil Procedure be given a liberal interpretation "to obtain a just, fair, equitable and impartial adjudication of the rights of litigants", we hold that the points assert the evidence is insufficient to support findings of vital facts, being whether or not the evidence is sufficient to support the implied findings of fact that the well was drilled on a competitive contract and at the usual rates prevailing in the area.

Findings of fact and conclusions of law were neither requested nor filed. "The trial court's judgment, therefore, implies all necessary fact findings in support of the judgment". Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W.2d 609 (1951). The judgment must be affirmed if there is sufficient evidence to support it on any lawful theory, and every fact issue sufficiently raised by the evidence must be resolved in support of the judgment. City of Abilene v. Meek, 311 S.W.2d 654 (Tex.Civ.App.— Eastland 1958, writ ref'd); International Security Life Ins. Co. v. Jasper, 453 S.W.2d 241 (Tex.Civ.App.—Amarillo 1970, writ ref'd. n. r. e.); Reynolds-Land, Inc. v. Raleigh, 435 S.W.2d 255 (Tex.Civ.App.— Texarkana 1968, n. w. h.).

Basically, this is a case where the plaintiff, a party to the operating contract, has alleged that it has fully performed its obligation to drill the well at the expense of the joint owners of the lease and is entitled to maintain suit against the defendants, the other parties to the operating contract, for the cost of drilling the dry hole as they (the defendants) have breached the contract by failure to pay their part of the cost incurred after having agreed to participate in the drilling operations.

Defendants admit in their brief that they authorized the drilling of the well at the suggested location described in the letter from plaintiff dated November 17, 1970. However, they contend that the AFE as submitted by plaintiffs and as accepted by them authorized the drilling of the well on a footage basis only, whereby the well owners would pay to the drilling contractor the usual rate prevailing in the area per foot actually drilled, and in addition thereto, would pay the third party costs described in the AFE. In effect, defendants assert that there has been a breach of contract and

such breach is set up by them as a defense to the action brought by plaintiff in the contract. See 13 Tex.Jur.2d Contracts, § 361, pp. 636, 637.

It is established by the record that wells drilled in search of oil or gas are customarily drilled on either a turnkey, footage or day rate contract. On a "turnkey" basis, the parties agree on a fixed sum of money that will be paid to the drilling contractor in return for his furnishing a drilling crew, drilling equipment and certain specified materials and services, to be due and payable only after the hole is drilled to contract depth; all other services, materials and equipment are furnished at the cost of the well owner. On a "footage basis", the drilling contractor furnishes the drilling crew, drilling equipment and certain specified services, materials and supplies; he is paid an agreed sum of money for each foot actually drilled, irrespective of whether the proposed depth is reached or not; all other materials, supplies and equipment are furnished by the well owner. On a "day rate" basis, the drilling contractor furnishes the drilling crew and drilling equipment; he is paid an agreed sum of money for each day spent in drilling regardless of the number of days involved; all materials, services and supplies that are not agreed to be furnished by the contractor are furnished by the well owner.

Plaintiff admits that it was unable to obtain a contract for the drilling of the well on a footage basis. It contends that the actual contract that was entered into providing for the drilling of the well on a day rate basis was made after it had been determined by plaintiff that the cost estimate prepared by it on the basis of Stewart Well Service's bid was "in line with the proposals made by other contractors bidding". We do not agree. The only direct evidence shows that the drilling contractors who actually submitted bids were Rhodes & Hicks Drilling Corporation, Frio Drilling, Inc., Valley Well Service, Inc., and Bill Pearl Drilling Co., already noted.

None of these bids were based on a day basis. In essence, the bids by Rhodes & Hicks Drilling Corporation, Valley Well Service, Inc. and Bill Pearl Drilling Co. were each "turnkey" bids. The bid of Frio Drilling, Inc. was based on "footage".

Had the well been drilled by either Rhodes & Hicks Drilling Corporation or by Bill Pearl Drilling Co., the total cost to drill, plug and abandon the well would have been substantially less than the estimated cost of $23,425.00 set out in the AFE. The well, if drilled by Valley Well Service, Inc., would have cost several thousands of dollars more than the estimated costs contained in the AFE but substantially less than $48,751.12, the actual cost incurred under the day rate contract. The record is not clear as to what the well would have cost had it been drilled by Frio Drilling, Inc.

The decision to commence the drilling of the well in December, 1970, was made by plaintiff. No necessity or emergency condition was shown by the evidence to exist which required that the well be drilled at the time it was drilled. On the other hand, it was agreed by all parties that the well could have been drilled at any time following the return of the signed AFE up to as late as March, 1971. The evidence showed that, while Rhodes & Hicks did not have a drilling rig available in late December, 1970, it did have one available about January 15, 1971 and could have drilled the well in accordance with its bid of November 9, 1970 at any time from the middle of January, 1971 until as late as April of that year. In addition, Mr. Rhodes, the president of Rhodes & Hicks, testified that had plaintiff notified his company within "ten or fifteen or twenty days" after November 9, 1970, his company could have drilled the well in December, 1970.

The evidence reflects that Stewart Well Service experienced difficulties in drilling the well. Defendants contend that the AFE contemplated that the well would be drilled with a conventional drilling rig and equip-

ment that was designed and built for drilling purposes. They charge plaintiff with using a workover rig that was not suitable for drilling purposes. They say that had a conventional drilling rig been employed, no difficulties would have been experienced and the well would have been drilled, plugged and abandoned for a sum of money less than the estimated cost contained in the AFE. Plaintiff disputes defendants' claims and says that the rig used was a workover rig that had been modified for drilling purposes and was powered with adequate equipment to drill the well. The evidence also reflects that Rhodes & Hicks drilled a well on the same lease in 1969 to about 4500 feet. The well was drilled in four or five days. In the summer of 1971, Padre Drilling Company drilled a well to 4258 feet on the Jarbeaux Lease that required less than four days drilling time. In both instances, a conventional drilling rig was used; no difficulties were encountered. Padre Drilling Company's charges, including logging costs, were $18,230.00; it was estimated that the total costs (actual drilling costs plus third party charges) amounted to about $24,000.00. The actual drilling costs, exclusive of logging expenses, of the well drilled by Rhodes & Hicks in 1969 amounted to $14,942.50.

Plaintiff asserts that the evidence establishes "that the well was drilled on a competitive basis at the usual rates prevailing in the area" in that the contract was made with the only drilling contractor who could commence the drilling of the well in 1970. This contractor insisted on a day rate contract. The evidence is insufficient to show a valid reason for letting the contract to drill the well at a time when only one drilling contractor had a rig available. The effect of entering into such contract was to reduce competition. " 'Competitive bidding' requires due advertisement, giving opportunity to bid, and contemplates a bidding on the same undertaking upon each of the same material items covered by the contract; upon the same thing. It requires

that all bidders be placed upon the same plane of equality and that they bid upon the same terms and conditions involved in all the items and parts of the contract, and that the proposal specify as to all bids the same, or substantially similar specifications". Sterrett v. Bell, 240 S.W.2d 516 (Tex.Civ.App.—Dallas, 1951, n. w. h.), quoted at page 527 in Texas Highway Commission v. Texas Association of Steel Importers, Inc., 372 S.W.2d 525 (Tex.Sup. 1963).

In discussing what constitutes competitive bidding, the Supreme Court, in Vilbig Bros. v. City of Dallas, 127 Tex. 563, 91 S.W.2d 336, 339 (1936) said:

"Two forms of competition may exist. One is secured by calling for bids on only one kind of material for the work, which is a competition among bidders on the same thing. The other is secured by calling for bids on several kinds of material, any one of which is suitable for the work; this form brings bidders on different things in competition with each other. The latter kind of competition includes, it seems plain, the former. . . . "

In the instant case, we are faced with the first form of competition. It is true that a well in search of oil or gas may be drilled on either a day rate, a turnkey or a footage basis, any of which is suitable for the work, but the equipment, labor, tool rentals, materials and supplies furnished by the drilling contractor under any one of such bases is quite different from those furnished under either of the other two.

The courts in a number of states have held that "competitive bidding" means that all contractors must make bids upon the same specifications, a common standard, a common basis, upon the same thing, the same subject matter, the same undertaking, and upon the same terms and conditions. See the dissenting opinion of Justice Griffin in Texas Highway Commission v. Texas

Association of Steel Importers, Inc., 372 S.W.2d 525, supra, at page 533, for a collection of out of state decisions that follow the above stated rule. We perceive no reason why the rule announced in Sterrett v. Bell, supra, and in the out of state cases cited by Justice Griffin, above mentioned, should not be applied in this, a competitive contract case.

The purpose of requiring wells to be drilled "on a competitive contract basis" is to secure the best work, materials and equipment at the lowest practicable price, for the best interests and benefit of the well owners. There can be no contract on a competitive basis where the terms of the letting thereof unduly restrict competition or increase the cost of the work or of the materials or services going into the project itself.

The evidence that plaintiff contacted at least 30 drilling contractors is at least some circumstantial evidence that competitive bids were solicited for the drilling of the well but the evidence is insufficient to determine from the record the basis upon which such bids, if any, were submitted. The evidence shows that the usual prevailing rates in the area where such well was drilled on a footage basis varies from $1.75 to $2.25 per foot. Frio Drilling, Inc., however, submitted a bid in December 1970 at $3.85 per foot. We are unable to determine from the record the usual prevailing rates in the area of the Jarbeaux Lease where the wells are drilled on a day rate basis. The AFE made mention of a day rate of $1,100.00 per day where the contractor furnished the drill pipe and $1,050.00 per day without drill pipe. The bid from Frio Drilling, Inc. quoted $1,350.00 per day with drill pipe and $1,300.00 per day without drill pipe. It is also shown by the record that, generally speaking, the cost of drilling a well on any basis is greater during the latter part of the year than at other times. The contract entered into by and between plaintiff and Stewart Well Service provid-

ed for a day rate basis of $1,200.00 per day, with or without drill pipe.

█ We have examined the record in its entirety and conclude that the evidence is factually insufficient to support the implied findings of fact that the well in question was drilled on a competitive contract basis at the usual rates prevailing in the area, as required by Section 15 of the operating agreement. We, therefore, hold that the evidence is factually insufficient to support the judgment rendered. See Woodward v. Ortiz, 150 Tex. 75, 237 S.W. 2d 286, 292 (1951). Defendants' first and second points are sustained.

In any event, the case should be remanded in the interest of justice. The record shows that the estimated costs contained in the AFE are reasonable; the basis for such costs stemmed from a study of the turnkey bid submitted by Rhodes & Hicks. The defendants had plausible reasons for assuming that the drilling contract would be let on a footage basis; they were never notified by plaintiff prior to commencement of drilling operations that the well would be drilled on a day rate basis. The cost estimate prepared by plaintiff after a study of the Stewart Well Service bid was never communicated to defendants prior to the letting of the contract for and the drilling of the well. The defendant Richard E. Haas is experienced in the matter of drilling wells for oil and gas. He testified that the reasonable cost of drilling, plugging and abandoning the well on a footage contract at the price quoted in the AFE if a conventional drilling rig and adequate equipment had been used would have been $17,172.17. The defendant Joe Buford testified that he thought the well was to be drilled on a footage basis and he did not expect the total cost to run any more than the figure shown in the AFE. Defendants alleged in their pleadings that "the reasonable value of the services and materials furnished to the defendants by the plaintiff is $8,810.20", and that they of-

fered to tender what they consider their reasonable share of the reasonable cost of the drilling of such well. It is virtually undisputed that the plaintiff is entitled to some amount of money.

We believe that the case was tried under the wrong theory, or at least under an erroneous understanding of the applicable legal principles. In this respect, we do not believe that the case has been fully developed. Were we to hold that the points asserted by appellants were "no evidence" points and if we were of the opinion that such points should be sustained, then, in that event, for the reasons hereinabove set forth, we feel that the ends of justice would be better served by remanding the cause for a new trial rather than by reversing it and rendering judgment that plaintiff take nothing. See Texas Sling Company v. Emanuel, 431 S.W.2d 538 (Tex.Sup.1968); Southampton Civic Club v. Couch, 159 Tex. 464, 322 S.W.2d 516 (1958); London Terrace, Inc. v. McAlister, 142 Tex. 608, 180 S.W.2d 619 (1944); U. M. & M. Credit Corporation v. Doss, 452 S.W.2d 45 (Tex.Civ.App.—Dallas 1970, writ ref'd n. r. e.); Atchison, Topeka & Santa Fe Railway Co. v. Porter, 411 S.W.2d 615 (Tex.Civ.App.—Amarillo 1967, writ ref'd n. r. e.); Burrus Feed Mills, Inc. v. Hein, 399 S.W.2d 950 (Tex.Civ.App.—Houston 1966, writ ref'd n. r. e.).

In view of the disposition that we make of this case, it is not necessary for this Court to consider defendants' thrid and fourth points.

Accordingly, the judgment of the trial court is reversed and the cause is remanded for a new trial.

SHARPE, Justice (concurring).

I concur in the judgment of this Court reversing the judgment of the lower court and remanding the case for new trial for the reasons stated in this separate opinion.

Appellants' points of error read as follows:

"Point 1. The trial court reversibly erred in entering the appealed-from judgment, because the evidence wholly failed to prove that the well in question was drilled on a competitive contract basis. Point 2. The trial court reversibly erred in entering the appealed-from judgment, because the evidence wholly failed to prove that the well in question was drilled at the usual rates prevailing in the area where it was drilled.

Point 3. The trial court reversibly erred in entering the appealed-from judgment, because the evidence wholly failed to prove that the well in question was drilled on a footage basis.

A. The evidence wholly failed to prove that the well in question was drilled on a competitive contract basis.

B. The evidence wholly failed to prove that the well in question was drilled at the usual rates prevailing in the area where it was drilled.

C. The evidence wholly failed to prove that the well in question was drilled on a footage basis.

Point 4. The trial court reversibly erred in entering the appealed-from judgment if by that judgment that court sustained any quantum meruit ground of recovery, because the evidence wholly failed to prove the reasonable value of the services rendered and material furnished in drilling the well in question."

In my view all of appellants' points of error are "no evidence" points, which raise only questions of legal insufficiency of the evidence, and should be passed upon under the rules applicable to that type of contention. See: Garza v. Alviar, 395 S.W.2d 821 (Tex.Sup.1965); Chemical Cleaning,

Inc. v. Chemical Cleaning and Equipment Service Inc., 462 S.W.2d 276 (Tex.Sup. 1970), per curiam opinion refusing n. r. e. 456 S.W.2d 724 (Tex.Civ.App., Beaumont, 1970).

I cannot find a basis for considering appellants' points as raising questions of factual insufficiency of the evidence considering the points themselves and the statements and arguments thereunder. In my view the assertion in each of appellants' points of error that the evidence "wholly failed to prove" the various matters included in such points raises only question of legal insufficiency of the evidence, i. e. "no evidence" points.

It is well settled that when a Court of Civil Appeals sustains a contention of factual insufficiency which constitutes reversible error, remand, *not rendition,* follows. In that situation a consideration of remand in the interest of justice is not necessary or proper. However, when the Court of Civil Appeals sustains contentions of legal insufficiency of the evidence (no evidence points), rendition of judgment usually follows unless the court concludes that the case should be remanded in the interest of justice. In my view the situation just mentioned is what we are dealing with here.

I would sustain appellants' points one and two on the basis that they raise "no evidence" points and reverse the judgment of the trial court. However, I would not render judgment in favor of appellants but, instead, in the interest of justice would remand the case for a new trial. Rule 434, T.R.C.P.; Praetorian Mutual Life Insurance Co. v. Sherman, 455 S.W.2d 201 (Tex. Sup.1970); Texas Sling Company v. Emanuel, 431 S.W.2d 538 (Tex.Sup.1968); Aetna Insurance Co. v. Klein, 160 Tex. 61, 325 S.W.2d 376 (1959); Hicks v. Matthews, 153 Tex. 177, 266 S.W.2d 846 (1954).

For the reasons stated I concur in the judgment of this Court which reverses that of the trial court and remands the case for trial.