**LABRADOR OIL COMPANY,**
Appellant,

v.

**NORTON DRILLING COMPANY,**
Appellee.

No. 07–98–0142–CV.

Court of Appeals of Texas,
Amarillo.

Aug. 24, 1999.

Crady Jewett & McCulley LLP, Ross Spence, Gregory S. Hudson, Houston, Murchison Hund & Harriger LLP, Bill Harriger, Lubbock, for appellant.

Carr Hunt Wolfe & Joy LLP, Gary M. Bellair, Donald M. Hunt, Lubbock, for appellee.

Before BOYD, C.J., and QUINN and REAVIS, JJ.

DON H. REAVIS, Justice.

Labrador Oil Company appeals from a judgment based in part upon a jury verdict in favor of Norton Drilling Company awarding recovery for balance owing for daywork charges under a standard IADC written contract [1] for the drilling of a well, and recovery for damage to or loss of Norton's drill pipe. By five issues, Labrador contends the trial court erred (1) in disregarding the jury's answer to Question 6 concerning Labrador's mitigation of damages, (2) when it refused to reduce Norton's judgment by the salvage value of the damaged drill pipe retained by Norton, (3) when it failed to establish the salvage value offset to which Labrador was entitled at $166,650.00, (4) by applying the wrong measure of prejudgment and post-judgment interest and granted an incorrect judgment for interest in favor of Norton, and (5) by refusing to grant Labrador leave to file a trial amendment. Norton also presents one cross-issue contending the trial court erred in rendering a judgment based on the jury's answer to Question 7, which inquired as to the amount of reimbursement owed for the damage or loss of in-hole equipment belonging to Norton, because the jury's answer lacked the requisite evidentiary support. Based upon the rationale expressed herein, we will affirm.

Labrador (as operator) and Norton (as contractor) entered into a written con-

---

1. International Association of Drilling Contractors Drilling Bid Proposal and Daywork Drilling Contract—U.S.

tract[2] for the drilling of a well to an anticipated depth of 19,000 feet, using the IADC form contract. In the oil and gas industry, wells are commonly drilled on "turnkey," "footage," or "day rate" contracts.[3] Here, the parties agreed to drill the well on a "daywork basis" under the "direction, supervision and control" of Labrador. As relevant, subparagraph 4.4 entitled "Operating Day Rate" provided that the day rate compensation would be $6,216.00 if Norton provided the drill pipe, but if Labrador's drill pipe was used, the daily rate would be $6,000.00. Also, it contained a special provision that "after 100 days the dayrate will go to $6000.00/day with or without drill pipe." In addition, subparagraph 14.2 provided as follows:

> 14.2 Contractor's In–Hole Equipment: Operator shall assume liability at all times for damage to or destruction of Contractor's in-hole equipment, including, but not limited to, drill pipe, drill collars, and tool joints, and Operator shall reimburse Contractor for the value of any such loss or damage; the value to be determined by agreement between Contractor and Operator as current repair costs or *80* percent of current new replacement cost of such equipment delivered to the well site.[4]

Norton's rig inventory, which was attached to the IADC contract, showed among other things, 21,000 feet of drill pipe on hand. However, before Labrador signed the contract, Norton sent Labrador the following message:

> Mike, I found 19 drill pipe inspections covering the period from February 1995 to present. I found 3227 jts inspected, 2786 jts premium for 86.33% good usable pipe and 13.67% unusable. If you agree we can use these figures to deter-

mine fair wear and tear. Any losses you will replace or pay for beyond 13.67%. Let me hear from you so we can get started moving the rig.

The contract also provided that Labrador would pay Norton $91,000.00 as a demobilization fee but by letter agreement dated May 10, 1996, the parties agreed that the fee would be $50,000.00 if only one well was drilled.

Inspections of Norton's drill pipe components were made by Labrador and Labrador accepted the components as in compliance with industry standards before commencement of drilling operations on June 28, 1996. A few days after drilling commenced, drilling operations were suspended and "fishing" commenced because a shock sub furnished by Labrador parted. Drilling operations resumed but problems impaired operations from time to time. Labrador ceased using some of the components provided by Norton; however, Labrador continued using other components provided by Norton until the hole had reached a depth of near 13,000 feet. After Labrador determined that Norton's drill pipe had worn below industry standards and was no longer suitable, it ceased using Norton's damaged drill pipe. Labrador recognized its responsibility to repair or replace the drill pipe, but decided at that time to continue drilling operations with rented replacement pipe instead of repairing or replacing the damaged pipe on site. However, drilling ceased after several thousand feet of drill pipe, which included some components supplied by Norton, fell into the hole after a rental component failed, and the rig was released November 1, 1996. Following Labrador's failure to pay Norton's invoices and replacement of the lost or damaged portion of Norton's drill pipe, Norton filed suit.

---

2. Norton signed the contract on April 19, 1996. Labrador signed the contract on May 7, 1996.

3. *Haas v. Gulf Coast Natural Gas Company*, 484 S.W.2d 127, 131 (Tex.Civ.App.—Corpus Christi 1972, no writ).

4. The figure 80 was inserted into the form contract.

By its trial pleading, Norton sought to recover $50,000.00 for demobilization expense, the balance owing on the daywork contract in the amount of $302,298.97, and 80% of the new replacement cost of its damaged or lost equipment which included 439 joints of drill pipe, interest and other damages. Labrador responded by alleging numerous affirmative defenses, set off and a counterclaim, including Norton's negligence, fraud, breach of contract and Deceptive Trade Practices Act violations.[5] Upon completion of a six-day trial, the trial court submitted its charge which included eight questions. By its answers, the jury found that (1) both Labrador and Norton failed to comply with the written agreement, which the court instructed included the IADC contract, the rig inventory, and the May 10, 1996 letter agreement; (2) Norton engaged in false, misleading or deceptive acts or practices which was a producing cause of damages; (3) Norton did not knowingly engage in such conduct; (4) Norton made a negligent misrepresentation on which Labrador justifiably relied; (5) the balance owing to Norton for daywork charges was $302,298.97; (6) the reasonable and necessary expense of Labrador in renting replacement drill pipe was $60,406.99, and that the reasonable value of time spent by Labrador due to the problems caused by Norton's failure to comply with the agreement was $7,456.00; (7) the value of the replacement pipe due to Norton was $127,400.00; and (8) the salvage value of Norton's drill pipe was $26,895.00.

Following consideration of Norton's motion to disregard jury findings to Questions 2, 4, 6, 7, and 8, the trial court granted the motion as to Question 8 ($26,-895.00 salvage value of Norton's drill pipe), and partially granted the motion as to Question 6, disregarding the jury finding that $60,406.99 was the reasonable cost of renting replacement drill pipe, and denied the motion as to the remaining questions. Accordingly, while acknowledging that, per stipulation of the parties, Norton was entitled to recover a $50,000.00 demobilization fee and Labrador was entitled to a credit of $8,720.00, the trial court entered judgment that Norton recover against Labrador the sum of $463,522.97 together with prejudgment interest in the amount of $84,066.83, calculated at eighteen percent (18%) per annum on the sum of $343,-578.97 of the judgment from December 20, 1996, and at the rate of eighteen percent (18%) per annum on the sum of $119,-944.00 of the judgment from February 13, 1997.

## Mitigation of Damages

By its first issue, Labrador contends that the trial court erred in disregarding the jury answer to the mitigation of damages portion of Question 6. We disagree. By Question 6, Labrador sought to set off the reasonable and necessary expenses which it "incurred in renting replacement drill string components."[6] At the charge conference, Norton objected to the submission of the question because (i) there was no evidence to support any expenses incurred in renting replacement pipe, (ii) as a matter of law, Labrador was not entitled to credit or any repayment for replacement pipe, and (iii) as a matter of law, Labrador was not entitled to any credit for any alleged problems with the drill pipe. By its answer, the jury found that the reasonable and necessary expense for "renting replacement drill string components" was $60,406.99. Following consideration of Norton's motion to disregard such jury finding, the trial court granted the motion. Labrador contends it was entitled to credit for the expense it incurred obtaining "drill string to replace Norton's inadequate drill string." Although Labrador contends that the drill pipe furnished by Norton did not meet industry stan-

---

5. Tex. Bus. & Com.Code Ann. §§ 17.01–17.854 (Vernon 1987 and Pamph. Supp. 1999).

6. In the oil and gas industry, "drill pipe" and "drill string" are used interchangeably.

dards, there was evidence that Labrador had inspected and accepted Norton's drill pipe as being within industry standards. Moreover, Question 6 did not include a finding, by implication or otherwise, that the rental expense was required because of any default by Norton or any defect in its drill pipe.

As above noted, subparagraph 14.2 of the written contract contemplated that Norton's equipment might be damaged or destroyed while it was "in-hole." By this paragraph, if any of Norton's equipment was damaged or destroyed while it was "in-hole," Labrador assumed the performance obligation of either repairing the damaged equipment or paying 80% of the current new replacement cost of the damaged or destroyed equipment. The contract did not give Labrador the alternative to rent pipe at Norton's expense or to replace the damaged equipment or drill pipe with used pipe.

First, the doctrine of mitigation of damages is not applicable to Norton's action against Labrador because of Labrador's failure to perform its obligation either to repair the equipment or pay 80% of the current price of the equipment delivered to the well site. Norton, being the party entitled to performance by Labrador to either repair the equipment or pay 80% of current new replacement cost may have had the duty to mitigate its losses, but the burden of proof on the issue was on Labrador. *Walker v. Salt Flat Water Co.*, 128 Tex. 140, 96 S.W.2d 231, 232 (1936); *Copenhaver v. Berryman*, 602 S.W.2d 540, 544 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.). By its answer to Question 1, the jury found that both Labrador and Norton had failed to comply with the written agreement and that their failure was not excused. Because Labrador's failure to perform under subparagraph 14.2 was not disputed and was not excused,

Labrador was not entitled to recover the rental value of the drill pipe under the doctrine of mitigation of damages.

■ Moreover, the written contract contemplated that Norton's equipment might be damaged or destroyed while it was "in-hole." By the provision, the parties agreed that Labrador assumed liability for damage or destruction and that Labrador would either repair the equipment or pay 80% of the current new replacement cost of such damaged or destroyed equipment, but this provision did not authorize Labrador to continue drilling operations with rented pipe at Norton's expense. A jury finding is immaterial only if the question should not have been submitted or if the question, though properly submitted, was rendered immaterial by other findings. *Salinas v. Rafati*, 948 S.W.2d 286, 288 (Tex.1997). Because Labrador did not repair the damaged pipe or pay 80% of the current new replacement cost, and the rental was required to replace Norton's "in-hole" damaged pipe, the jury finding is immaterial and the trial court did not err in disregarding it concerning rental expense.

Labrador also contends that Norton's poor drilling practices brought about excessive fatigue or damage to the drill pipe; however, we note that per the contract, drilling operations were under the "direction, supervision and control" of Labrador. Moreover, under the specific provisions of subparagraph 4.4 of the contract, where Labrador furnished the drill pipe, the day rate payable to Norton could have been reduced from $6,216.00 to $6,000.00, but Labrador did not elect to claim that adjustment.[7] Accordingly, Labrador's first issue is overruled.

### Salvage Value

■ Because issues two and three concern salvage value, we will consider them

---

7. Norton's letter of 4/30/90, transmitting two copies of the contract, indicated that "[w]ith regard to the daywork price, as you can see from the contract, if I furnish the pipe the price is $6,216.00 per day. After 100 days I will drop the daywork to $6,000.00 per day with or without drill pipe."

together. By its second issue, Labrador contends the trial court erred in refusing to reduce Norton's judgment by the amount of the salvage value of the damaged drill pipe retained by Norton, and by its third issue, contends the trial court erred in failing to establish the salvage value offset to which Labrador was entitled at $166,650.00. We disagree.

By Question 8 the jury was asked to determine "[w]hat sum of money, if any, if paid now in cash, is the salvage value of the drill string for which Norton Drilling Company is suing Labrador Oil Company"? At the charge conference, Norton objected to the submission of Question 8 on the ground that there "is no basis under which salvage value of the drill pipe is relevant to any issue in this case. We submit that is an irrelevant issue and, therefore, constitutes a comment on the weight of the evidence." Norton also moved to disregard the jury finding that the salvage value was $26,895.00, and the trial court rendered judgment denying Labrador any credit for the salvage value.

Citing over fifteen cases, Labrador contends that when damages to personal property are sought, they consist of the pre-loss fair market value less the post-loss fair market value and therefore, it was entitled to a credit in the amount of the salvage value of the pipe retained by Norton. However, the cases cited by Labrador are either negligence, insurance, tort, products liability, or DTPA cases, and none arise from a contract as applicable here. As discussed earlier, subparagraph 14.2 fixed liability upon Labrador for damage or destruction to Norton's drill pipe while "in-hole." By the contract, the parties agreed that Labrador would either pay "current repair costs" or pay 80% of the current new replacement cost, but the paragraph did not mention salvage value and did not contemplate that Labrador could fulfill its obligation by providing used . replacement pipe. Here, the parties contracted for Labrador's performance if any

of Norton's equipment or drill pipe was damaged or destroyed while "in-hole." Because parties to a contract may stipulate the amount of recoverable damages, and may contract to have an agreed remedy to be applied in the case of breach, the general rule allowing credit for salvage value does not apply to the obligation of Labrador under subparagraph 14.2 of the contract. *Lacy v. Ticor Title Ins. Co.*, 794 S.W.2d 781, 791 (Tex.App.—Dallas 1990), writ denied, 803 S.W.2d 265 (Tex.1991) (per curiam).

■ To complete our analysis of Labrador's second and third issues regarding salvage value, we need to consider the jury's answers to Questions 7 and 8. Also, because Norton's cross-issue, by which it contends the trial court should have disregarded the jury's answer to Question 7 relates to this discussion, we will review Norton's cross-issue together with Labrador's second and third issues. Question 7 and its answer reads as follows:

> What sum of money, if any, if paid now in cash, would compensate *Norton Drilling Company* for the failure to comply by *Labrador Oil Company* with the **parties' agreement concerning replacement pipe**?
>
> The value of the replacement pipe is to be determined at the time and place of performance.
>
> Answer in dollars and cents for damages, if any:
>
> Answer: *$127,400.00.*[8]

The record shows the following announcements occurred during the charge conference, regarding Question 7:

> MR. SPENCE: And then the only other thing I would like to say is in—I think it is Question Number 7—that is the one that we, amongst Counsel, we agreed to just ask about the replacement pipe agreement in a global damage question, so that the jury will ultimately decide really what that agreement con-

---

**8.** Emphasis added.

sisted of, but both parties agree to stipulate that there was an agreement regarding replacement pipe, but there is a hot dispute as to what it entails.

So neither party is waiving their understanding of what that agreement was, but we are agreeing to submit all of that to the jury. Is that your understanding, Mr. Fouts?

MR. FOUTS: Yeah. My understanding is: We are not submitting any questions to the jury about what the agreement was. Both sides have a different view about what it is.

THE COURT: We are just going to submit the—My understanding is: Everybody is agreeing that there was an agreement, and it was not complied with, and we are submitting it as damage, and we will let the jury decide what the agreement was, without having to go through multiple questions. I think, by setting the damage, they are going to determine what the agreement was.

MR. FOUTS: All right.

THE COURT: We will see. I don't know any other way to do it.

During the charge conference, Norton also objected to Question 8 as being irrelevant, contending there was no basis under which salvage value of the drill pipe would be relevant to any issue in the case. Regarding Question 7, Norton also took the position that the written contract was controlling, but if the court was going to submit a question about any deviation, it would not object to the form of Question 7. Except for the trial court's refusal to submit requested questions regarding fraud and breach of warranty, which are not presented on appeal, Labrador did not otherwise object to the charge as submitted.

As in the trial court, Norton contends that the evidence of new replacement cost conclusively shows that Norton should recover $420,512.18, in accordance with subparagraph 14.2 of the contract; however, before Labrador signed the contract, Norton advised Labrador that according to its review of drill pipe inspections, ordinary wear and tear on the drill pipe was 13.67% and requested that Labrador advise if that factor should be considered. Contrary to Norton's assertion, there is some evidence in the record that Norton agreed to accept used pipe provided by Labrador as fulfillment of Labrador's obligation under subparagraph 14.2, and also included in the record is evidence of referrals as late as January 1, 1997, from Norton to Labrador advising where used pipe could be purchased at $12.00 per foot. Some evidence also showed that Norton purchased used pipe at prices ranging from $2.40 per foot to $7.00 per foot, which was substantially below the prices of $29.00 to $34.00 per foot for new pipe reflected on Norton's invoices. The announcements of counsel for both parties at the charge conference acknowledged that the parties did have an agreement regarding replacement pipe, but the parties did not agree as to the terms of the agreement.

Counsel and the court were aware that Question 7 was a global question, which had the effect of invoking the rules announced in *Allen v. American National Insurance Company*, 380 S.W.2d 604, 609 (Tex.1964), that objections to charges are required, otherwise the jury answers will be the basis of the judgment regardless of how the question is submitted. Like the charge in *Austin State Hosp. v. Kitchen*, 903 S.W.2d 83, 92 (Tex.App.—Austin 1995, no writ), Question 7 collapsed multiple questions into one question, thereby subsuming all questions regarding "the parties' agreement concerning replacement pipe" into one global question. Here, the jury was aware from the evidence that although some of Norton's drill pipe was never recovered from the hole, many joints were retained by Norton. Without instructions to the contrary, in determining the amount of money necessary to compensate Norton for Labrador's failure to comply with the agreement concerning replacement pipe, the jury had to determine whether the salvage value was part of the agreement, and if it was, the amount

thereof. By the jury's answer that $127,-400.00 would compensate Norton for Labrador's failure to comply with the agreement concerning drill pipe, because there were no objections to the submission of a global question and the answer was based upon the jury's determination of the agreement, the trial court did not err in denying Labrador any salvage credit.

We have not overlooked Labrador's third issue, by which it contends that salvage value was established as a matter of law at $166,650.00 based upon Norton's answers to interrogatories. Because of our analysis that salvage value was not recoverable under the terms of the written agreement, or was subsumed into Question 7, a separate analysis is not necessary. Accordingly, Labrador's second and third issues are overruled, and Norton's cross-issue is overruled.

■ By issue four, Labrador contends the trial court applied the wrong measure of prejudgment and postjudgment interest and granted an incorrect judgment for interest in favor of Norton. We disagree. Paragraph 5 of the agreement entitled "TIME OF PAYMENT" contains three subparagraphs. Because the third provision covers attorney's fees, it is not material to our discussion; however, subparagraph 5.1 provides in part as follows:

> 5.1 Payment for mobilization, drilling and other work performed at applicable day rates, **and all other applicable charges** shall be due, upon presentation of invoice therefor, upon completion of mobilization, completion of the well, or at the end of the month in which such work was performed **or other charges** are incurred, whichever shall first occur.... [9]

Subparagraph 5.2 provided that the "Operator shall pay all invoices within 20 [10] days after receipt," and if not timely paid, interest accrued at the rate of 1.5 percent per month from due date until

paid. Norton invoiced Labrador for day-work and other work on November 30, 1996. Then on January 23, 1997, Norton sent four replacement invoices for the damaged drill pipe which replaced its prior invoices dated September 10, 1996, October 24, 1996, November 11, 1996, and January 3, 1997.

By its argument, Labrador first contends the agreement allowing replacement of drill pipe was a separate oral contract which did not provide for interest. We disagree. Question 7 was directed to the replacement of damaged equipment while it was "in-hole," as covered by subparagraph 14.2 of the contract, and was not directed to subparagraph 5.2. Accordingly, although subparagraph 14.2 may have been modified, the parties effected a continuation of the remainder of the contract, except as changed. *Greenbelt Elec. Coop., Inc. v. Johnson,* 608 S.W.2d 320, 324 (Tex. Civ.App.—Amarillo 1980, no writ). Regarding Labrador's second contention, the 20 days had expired from the date of the original invoices submitted by Norton. Labrador's third contention is not controlling because subparagraph 5.1 uses broad and all inclusive terms or phrases such as "and all other applicable charges" and "or other charges." We hold that the amount owing for replacement pipe was covered by subparagraphs 5.1 and 5.2 of the IADC contract. Labrador's fourth issue is overruled.

■ By its fifth issue, Labrador contends the trial court erred by refusing to grant it leave to file a trial amendment. We disagree. Labrador asserts that during trial, Norton complained that Labrador's pleadings were insufficient to raise defenses that (i) the rig inventory was part of the IADC contract, (ii) the written contract was orally amended; however Labrador's brief does not make reference to where the objections and any ruling thereon can be found in the record. In connec-

---

**9.** Emphasis added.

**10.** The figure 20 was inserted into the form contract.

tion with this contention, Labrador had the burden of directing this Court to the portions of the record which supported its complaint. *See* Tex.R.App. P. 38.1(h). A court of appeals is not required to search a voluminous record without guidance from appellant to determine whether an assertion of reversible error is valid. *Granada Biosciences, Inc. v. Barrett*, 958 S.W.2d 215, 222 (Tex.App.—Amarillo 1997, pet. denied). Moreover, the trial court's instruction to Question 1 instructed the jury that the written agreement consisted of the signed daywork contract, the rig inventory, and the May 10, 1996 letter agreement. Regarding the alleged oral agreement, during the charge conference, Norton's counsel acknowledged the existence of an agreement concerning "replacement" pipe and the trial court submitted global Question 7. These matters were presented to the jury without objection from Labrador. *See* Tex.R. Civ. P. 272. Issue five is overruled.

Accordingly, the judgment of the trial court is affirmed.