# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-16-00322-CV

**Rebeca D. Balderas-Ramirez, Appellant**

**v.**

**Anthony Carl Felder, Appellee**

### FROM THE COUNTY COURT AT LAW NO. 2 OF TRAVIS COUNTY
### NO. C-1-CV-11-013353, HONORABLE ERIC SHEPPERD, JUDGE PRESIDING

## O P I N I O N

Rebeca D. Balderas-Ramirez appeals a final summary judgment that she take nothing on claims she had asserted against Anthony Carl Felder following an automobile collision. The pivotal issues on appeal concern whether Balderas-Ramirez presented any competent evidence of property damages—including several years' worth of claimed loss-of-use damages—and whether any such damages exceeded amounts for which she has already been compensated by Felder's insurance carrier. We will affirm the judgment.

## BACKGROUND

The collision in question occurred on or about December 18, 2011, when Felder rear-ended Balderas-Ramirez's vehicle on the MoPac expressway. Within a week thereafter, Balderas-Ramirez filed suit against Felder, asserting theories of negligence and negligence per se founded on alleged acts that included driving while intoxicated. At the suit's inception, Balderas-

Ramirez sought recovery of alleged personal-injury damages, but those claims were settled within a few months by Felder's automobile insurance carrier, USAA. In the meantime, Balderas-Ramirez had also made a property-damage claim with USAA. That claim did not settle, and she eventually amended her pleadings to seek recovery of those alleged damages instead.

Balderas-Ramirez had purchased the vehicle she had been driving—a 1999 Toyota 4Runner—about three weeks prior to the collision. She purchased the 4Runner from a Laredo used-car dealer, Zapata Auto Center, for a sale price of approximately $7,000. The purchase was effected through an installment-sales contract under which Balderas-Ramirez made a $2,500 down payment and agreed to satisfy the remaining balance (including interest and finance charge) through monthly payments to Zapata, the first of which was to come due on December 22, 2011 (less than one week after the collision). The contract also explicitly granted Zapata a security interest in the vehicle to secure Balderas-Ramirez's debt.[1]

There is no dispute that the 4Runner was a total loss following the collision (i.e., repair, even if possible, would be economically infeasible relative to the vehicle's value[2]),

---

[1] Specifically, Balderas-Ramirez agreed to the following term:

**Security**: To secure all I owe on this contract and all my promises in it and any other debt I now owe you or in the future owe you, I give you a security interest in the motor vehicle being purchased.

[2] *See J&D Towing, LLC v. Am. Alternative Ins. Corp*., 478 S.W.3d 649, 657 n.30 (Tex. 2016) ("A vehicle is a 'total loss' when 'it would not be absolutely impossible to repair it, but the damages are so extensive that repair would not be economically feasible.'" (quoting *Morrison v. Campbell*, 431 S.W.3d 611, 617 (Tex. App.—Fort Worth 2014, no pet.)).

tantamount to the vehicle's total destruction.[3]  The general measure of direct damages in such instances is "the fair market value of the [vehicle] immediately before the injury at the place where the injury occurred,"[4] subject to a credit or offset, equal to the vehicle's salvage value, if the owner retains the vehicle.[5]  "Fair market value" is "the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying."[6]  In her suit, Balderas-Ramirez sought recovery of $7,000—the approximate total price for which she had purchased the 4Runner, including both down payment and credit—as the vehicle's "market value" immediately prior to the collision.

Balderas-Ramirez also prayed for $1,700 in "towing and storage charges," plus "loss-of-use" damages represented by the cost to rent a replacement vehicle between the date of the collision through trial and judgment.  The claim for loss-of-use damages would eventually become the most significant of all of Balderas-Ramirez's claims, at least in terms of financial stakes, because

---

[3]  *See id*. (recognizing that "total loss" of personal property is for damages purposes the equivalent of literal total destruction of the property (quoting *Morrison*, 431 S.W.3d at 617)).

[4]  *Id*. at 657 (citing *Texas & Pacific Ry. Co. v. Levi & Bro.*, 59 Tex. 674, 679 (1883); *Morrison*, 431 S.W.3d at 614; *Hartford Ins. Co. v. Jiminez*, 814 S.W.2d 551, 552 (Tex. App.—Houston [1st Dist.] 1991, no writ)); *see also id.* at 656 (explaining that the "default rule" for measuring direct damages to personal property, including motor vehicles, is "the difference in the market value immediately before and immediately after the injury to such property at the place where the damage was occasioned," (quoting *Pasadena State Bank v. Isaac*, 228 S.W.2d 127, 128 (Tex. 1950)), which reduces to recovery of the pre-collision fair market value when the vehicle is totally destroyed).

[5]  *See id*. at 657 n.30; *Labrador Oil Co. v. Norton Drilling Co.*, 1 S.W.3d 795, 800 (Tex. App.—Amarillo 1999, no pet.).

[6]  *PlainsCapital Bank v. Martin*, 459 S.W.3d 550, 556 (Tex. 2015) (quoting *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001)).

3

her suit lingered unresolved for several years. Eventually, in 2015, the suit was placed on the dismissal-for-want-of-prosecution docket, but was retained on Balderas-Ramirez's motion and set for trial in early 2016. And as that date approached, an additional key development bearing on Balderas-Ramirez's loss-of-use-damages claim occurred—the Texas Supreme Court handed down *J&D Towing, LLC v. American Alternative Insurance Corporation*,[7] in which it held that loss-of-use damages could be recovered when personal property is totally destroyed, rejecting a contrary prior prevailing understanding among Texas lower courts.[8]

In advance of the trial date, but after *J&D Towing* was decided, Felder filed the summary-judgment motion that became the basis for the judgment being challenged on appeal. In his motion, Felder asserted both traditional and no-evidence grounds challenging Balderas-Ramirez's entitlement to recover any of the property damages she was seeking.[9] In support of his traditional grounds, Felder presented evidence that centered on the claims-adjustment process undertaken by USAA on his behalf. This evidence included a "market evaluation report" prepared for USAA,

---

[7] 478 S.W.3d 649.

[8] *See id.* at 676 (following extensive analysis of jurisprudential history and policy, holding "that the owner of personal property that has been totally destroyed may recover loss-of-use damages in addition to the fair market value of the property immediately before the injury"); *cf. id*. at 662–63 (discussing lower court decisions "on the availability of loss-of-use damages in total-destruction cases" and observing that "most courts of appeals to consider this question have held that loss-of-use damages are unavailable"); *Mondragon v. Austin*, 954 S.W.2d 191, 193, 195–96 (Tex. App.—Austin 1997, pet. denied) (op. on reh'g) (acknowledging, and later questioning in dicta, the "rule" that loss-of-use damages are not recoverable in a total-destruction case).

[9] Balderas-Ramirez had also prayed for exemplary damages, and Felder moved for (and later obtained) summary judgment as to that claim on the grounds that Balderas-Ramirez had no underlying entitlement to actual damages and that the prior settlement had extinguished the claim. Balderas-Ramirez does not challenge this portion of the judgment on appeal.

4

which presented an analysis of the "actual cash value" of Balderas-Ramirez's vehicle immediately prior to the collision, taking account of its model year, mileage at the time (171,219), other specific features, history (e.g., a prior accident), and the local-market values of 4Runners having comparable features. The report concluded that the vehicle's actual cash value had been $5,750.

In turn, as reflected in a December 23, 2011, letter from USAA to Balderas-Ramirez's counsel and an affidavit from the USAA claims representative who handled the claim, also included in Felder's summary-judgment evidence, USAA had declared the vehicle to be a total loss and offered to settle Balderas-Ramirez's property-damage claim for $6,194.68, an amount that purported to compensate her for the value of her vehicle, plus various taxes and fees that would be associated with obtaining a replacement vehicle. There is no contention that Balderas-Ramirez accepted this particular offer (she would later explain that she had demanded her full $7,000 purchase price), but Felder presented evidence that Balderas-Ramirez's counsel did respond to a request made in the letter that he provide USAA with the name, address, and account number of "the finance company." On January 9, 2012, counsel faxed to USAA a copy of the installment-sales contract between Balderas-Ramirez and Zapata. On the following day, USAA issued a check to Zapata for $4,997.75—the total amount that Balderas-Ramirez was to pay Zapata under the installment sales contract—to fully satisfy the debt and Zapata's corresponding security interest in the vehicle.

Felder also presented summary-judgment proof to establish his right to an offset for the vehicle's salvage value. This evidence reflected that following the collision, Balderas-Ramirez's wrecked 4Runner had been towed and stored by Pronto Wrecker Service, where it had remained

during the claims-adjustment process.[10] In his affidavit, the USAA claims representative recounted that Balderas-Ramirez did not release the vehicle to USAA (which would have enabled the carrier to sell it for salvage), thereby retaining it as if she would be attempting to repair or sell it herself. Thereafter, as explained in deposition and affidavit testimony from Pronto representatives, Pronto ultimately auctioned off the 4Runner as salvage following the notice and expiration of time entitling it to treat the vehicle as abandoned.[11] This evidence further reflected that Pronto obtained $1,700 in proceeds from the sale and that it applied this amount to offset outstanding charges that included $150 for towing and $1,400 for storage ($20 per day times 70 days).[12]

Of final note, Felder presented evidence that in June 2013, USAA had issued a check in the amount of $241.15, made out to Balderas-Ramirez and her counsel, with the notation, "Loss of use payment under Property Damage Liability Coverage." Balderas-Ramirez and her counsel had then signed the check and deposited it.

Relying on his summary-judgment evidence, Felder asserted that Balderas-Ramirez could not, as a matter of law, recover any amount of the 4Runner's market value through her suit because: (1) the USAA market-value report established conclusively that the vehicle's pre-collision market value had been $5,750, not the $7,000 being alleged; (2) Felder's liability for this amount would be offset by the $1,700 in salvage value that Balderas-Ramirez had retained by not releasing

---

[10] USAA's December 23, 2011, letter had indicated that it would pay storage costs through December 27.

[11] See Tex. Occ. Code §§ 2303.151–.154 (notice requirements), .157 (right to sell unclaimed vehicle following notice).

[12] Other charges raised the total owing to $1,737.15, slightly higher than the $1,700 offset, but neither side has suggested that this difference or the other charges are material.

6

the vehicle, leaving her only $4,050 in market value that she could recover;[13] and (3) she had already been compensated for this loss—and more—through the $4,997.75 payment made on Felder's behalf to Zapata to pay off Balderas-Ramirez's debt on the vehicle. Felder further asserted a no-evidence ground challenging whether Balderas-Ramirez could present any competent evidence of the vehicle's market value, or at least of any value that would raise an issue of material fact in the face of his summary-judgment proof of market value and prior payment.

Felder additionally challenged, through traditional and no-evidence grounds, whether Balderas-Ramirez had actually incurred any loss of towing and storage charges, as she had claimed. As for loss-of-use damages, Felder urged that *J&D Towing* should not be applied "retroactively," leaving Balderas-Ramirez's claim governed by the prior prevailing rule that would bar such recovery in total-destruction cases. Alternatively, Felder urged that his summary-judgment evidence established conclusively that USAA's 2013 "Loss of use payment" for $241.15 had been an accord and satisfaction of Balderas-Ramirez's entire claim for those damages. Finally, Felder challenged through both traditional and no-evidence grounds whether Balderas-Ramirez could present any competent evidence to support her recovery of loss-of-use damages, or at least of any amount for which she had not already been compensated.

Balderas-Ramirez filed a response that chiefly emphasized her own testimony by affidavit and deposition. This included her opinion, presented under color of the "property owner

---

[13] Although Felder has used "market value" when referring to this net amount, he is more precisely referencing the amount of the 4Runner's pre-collision value that Balderas-Ramirez could legally recover as damages following total destruction; i.e., the vehicle's market value immediately before the collision, less the vehicle's salvage value if the owner opts to retain it instead of conveying it to the liable party or insurer.

7

rule," that her vehicle's market value immediately before the collision had actually been $7,500, higher than both Felder's valuation and the $7,000 she had previously demanded. She had derived this figure, she explained, by consulting online advertisements of 1999 4Runners being offered for sale in Travis County and averaging the listed prices. This calculation, she further suggested, found additional support in the fact that she had paid $7,000 for the vehicle a mere three weeks before the collision.

Balderas-Ramirez employed a similar methodology in regard to her claimed loss-of-use damages, which she urged were controlled by *J&D Towing* and therefore recoverable. She testified that she had periodically contacted rental car companies following the collision and derived an "opinion" that "the average rental cost in Travis County, Texas, from the date of the crash to now [February 2016, the date of her affidavit] is $80.00 per day." As for why or how she was entitled to recover loss-of-use damages for such an extended period, Balderas-Ramirez professed that she had been unable to work for three or four years after the collision (she claimed to be a professional photographer) "because of the pain that I have when I bend over, where I hurt myself in the accident," leaving her with insufficient financial resources to purchase a replacement vehicle. However, Balderas-Ramirez acknowledged during her deposition, in January 2016, that she had resumed working by that time and was earning $300 per day as a photographer. And during the interim, she also admitted, her then-husband had provided her a "truck" to drive. Although she did not specify the precise duration of this use, she indicated that the inception corresponded to her

8

resumption of driving following the collision[14] and ended when she and her husband later divorced, an event she placed in December 2015.  Balderas-Ramirez further disputed that any of her claims were foreclosed by the two payments USAA had made and insisted that Felder's summary-judgment evidence had supported rather than negated her claim for $1,700 in "towing and storage costs."

The trial court granted Felder's summary-judgment motion "in all respects" and rendered judgment that Balderas-Ramirez take nothing on her claims.  This appeal followed.

## ANALYSIS

In six issues, Balderas-Ramirez urges that the trial court erred in granting summary judgment as to Felder's no-evidence grounds and as to Felder's traditional grounds that were founded on the prior payments by USAA.

### Standard of review

We review summary judgments de novo.[15]  Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law.[16] We take as true any evidence favorable to the non-movant and indulge every reasonable inference from the evidence in the non-movant's favor.[17]

---

[14]  Balderas-Ramirez testified that she had been "really afraid to drive" following the collision and that her then-husband, "to help me recover, loaned me the truck to drive to places that were close by . . . so I could start driving again."

[15]  *See Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013).

[16]  *See* Tex. R. Civ. P. 166a(c); *BCCA Appeal Grp., Inc. v. City of Houston*, 496 S.W.3d 1, 7 (Tex. 2016).

[17]  *See Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017).

With respect to no-evidence grounds, the non-movant has the burden of presenting evidence to raise a genuine issue of material fact as to the elements of claims or defenses that were challenged in the motion.[18] No-evidence motions are essentially pretrial directed verdicts, and we review them under the same legal-sufficiency standard.[19] That is, we will affirm a grant of a no-evidence motion when the record reveals a complete absence of evidence of a vital fact, rules of law or evidence prevent the court from giving weight to the only evidence offered to prove a vital fact, the evidence offered to prove a vital fact is no more than a mere scintilla, or the evidence conclusively establishes the opposite of a vital fact.[20] With "traditional" summary-judgment grounds, in contrast, the movant must first present evidence that establishes or negates a claim or defense as a matter of law.[21] Only if this burden is met must the non-movant present evidence to raise a genuine issue of material fact that would defeat summary judgment.[22]

Where, as here, the trial court does not specify any particular grounds for its summary-judgment ruling, we must affirm on any meritorious ground presented in the motion and

---

[18] Tex. R. Civ. P. 166a(i); *see Lightning Oil Co.*, 520 S.W.3d at 45.

[19] *See Merriman*, 407 S.W.3d at 248.

[20] *See id.*; *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).

[21] Tex. R. Civ. P. 166a(c); *see KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 79 (Tex. 2015).

[22] *See Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex. 2014).

preserved on appeal.[23] Our analysis is confined solely to the grounds presented in the summary-judgment motion or response.[24]

**Market value**

In her first issue, Balderas-Ramirez insists that she raised a genuine issue of material fact regarding the 4Runner's fair market value by opining that the value was $7,500. She emphasizes the "property owner rule," the principle that a layperson is presumed qualified to testify to the market value of his or her own property, a subject on which an expert's testimony is otherwise required.[25] But as the Texas Supreme Court has explained, a lay property owner's *qualification* to testify to market value does not automatically mean that his or her opinions are competent evidence of market value. Rather, the witness must meet "the same requirements as any other opinion evidence"[26]—and this includes providing underlying factual bases for the opinion and not mere

---

[23] *See Neely v. Wilson*, 418 S.W.3d 52, 60 (Tex. 2013).

[24] *See Henkel v. Norman*, 441 S.W.3d 249, 251 n.1 (Tex. 2014) (per curiam) ("[A] summary judgment cannot be affirmed on grounds not expressly set out in the motion or response"); *City of Hous. v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex. 1979) (holding that reviewing courts may not reverse summary judgment for any ground not presented to trial court except for the sufficiency of the motion as a matter of law). And to the extent either party attempts on appeal to present new grounds for granting or denying summary judgment, we have not belabored them. *See* Tex. R. App. P. 47.1.

[25] *See Natural Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 155 (Tex. 2012).

[26] *Id.* at 156 (quoting *Porras v. Craig*, 675 S.W.2d 503, 504 (Tex. 1984)).

11

*ipse dixit*.[27] "This burden is not onerous," as a lay witness nowadays can look to an abundance of resources online and elsewhere regarding nearby sales and other relevant factors.[28]

In attempting to meet this burden, Balderas-Ramirez testified that at some point following the collision but "many years" before her January 2016 deposition, she had consulted www.autotrader.com and found three advertisements for sale of 1999 Toyota 4Runners in Travis County. She included printouts of these advertisements in her summary-judgment evidence. The sale prices at which the vehicles were being offered ranged from $6,995 for a green SR5 model with four-wheel drive and 170,019 miles, to $7,995 for a Limited model of unspecified color and 140,263 miles, to a tan Limited model with 141,565 miles that was being offered for $7,992.[29] As for how she had derived her $7,500 figure from the advertisements, Balderas-Ramirez explained that it represented an "average value."

Although Balderas-Ramirez did not personally recall the specific features of her own 4Runner aside from the color (which she described as "sand" but appearing green at night), the USAA market-value report, which she also included in her summary-judgment proof, as had Felder, reflected that hers had been a two-wheel drive SR5 model with 171,219 miles. Balderas-Ramirez did not indicate whether or how her "average value" had taken account of several obvious distinctions between her vehicle and the three comparators—among other things, the two higher-priced 4Runners had approximately 30,000 fewer miles than hers and had been Limiteds, a higher-

---

[27] *See id*. at 159.

[28] *See id.*

[29] Although Balderas-Ramirez refers solely to the two higher-priced models in her appellate briefing, her testimony actually cited all three figures as the bases for her market-value opinion.

tier model than her SR5, and none of the three advertisements had indicated prior damage from an accident. But even leaving aside such distinctions, the three advertisements do not supply a basis for Balderas-Ramirez's market-value opinion because they represent merely the price at which the other 4Runners were being offered for sale, as opposed to any prices at which the 4Runners were actually being sold.

Balderas-Ramirez overlooks that market value is a function of not only the seller's side of the transaction, but also the buyer's—it is, again, "the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, *and* is bought by one who desires to buy, but is under no necessity of buying."[30] Consequently, the price at which property is offered for sale is not, without more, evidence of its fair market value at the time of the listing.[31] While the offered price might be some evidence of the price a willing seller would accept, it is not evidence of the price a willing buyer would pay.[32] Balderas-Ramirez presented no more than the bare fact that other 4Runners had been offered for sale at particular prices, not any evidence of actual sales. The advertised prices do not provide a basis for her opinions as to market value.

Nor does the purchase price of Balderas-Ramirez's 4Runner provide a basis for her market-value opinion. Although Balderas-Ramirez emphasizes the relatively short (3-week) passage of time between her purchase and the collision, she presented no evidence that would permit a

---

[30] *PlainsCapital Bank*, 459 S.W.3d at 556 (quoting *City of Harlingen*, 48 S.W.3d at 182) (emphasis added)).

[31] *See Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 831 (Tex. 2014).

[32] *See id.*

reasonable fact finder to infer that the vehicle had necessarily remained in materially the same condition during the interim.[33] In the face of Felder's no-evidence challenge, she, not Felder, bears the burden of coming forward with that evidence. But even if the temporal proximity of the purchase in itself could support the inference, it remains that Balderas-Ramirez made the purchase in Laredo, whereas her burden was to establish fair market value in Travis County.[34] She made no attempt to supply any factual basis to support an inference that the Laredo purchase price would be materially similar to the Travis County fair market value.

Absent any underlying factual basis, Balderas-Ramirez's opinion as to the 4Runner's pre-collision fair market value was not competent and did not raise a genuine issue of material fact. Accordingly, we overrule her first issue. And aside from her first issue, Balderas-Ramirez has not challenged Felder's entitlement to summary judgment, per a traditional ground, that the 4Runner's correct fair market value had been $5,750. Nor has she contested Felder's entitlement, per other traditional grounds, to a $1,700 offset against this amount, reflecting the salvage value that she had

---

[33] *Cf. DZM, Inc. v. Garren*, 467 S.W.3d 700, 703–04 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (testimony insufficient to establish fair market value was identical to purchase price due to intervening passage of time and failure to address depreciation).

[34] *See J&D Towing, LLC*, 478 S.W.3d at 657; *see also Thomas v. Oldham*, 895 S.W.2d 352, 359 (Tex. 1995) (out-of-state owner's testimony legally insufficient to prove $3,000 reduction in value of her automobile when she did not specifically tie her valuation testimony to location of collision in Houston); *Peter Salpeter Energy Co., Inc. v. Crystal Oil Co.*, 524 S.W.2d 383, 387 (Tex. Civ. App.—Corpus Christi 1975, writ ref'd n.r.e.) (evidence of market value in adjacent county incompetent to establish market value of property in county where conversion occurred).

retained,[35] or that this would reduce Balderas-Ramirez's potential recovery of the vehicle's value to $4,050.

On the other hand, these unchallenged traditional grounds also effectively establish that Balderas-Ramirez was entitled to recover $4,050 for the 4Runner's value. Consequently, Felder's take-nothing summary judgment on this claim must also hinge on his traditional ground claiming a $4,977.75 credit against his potential liability—completely offsetting the $4,050 recovery, with $927.75 left over to apply against other claims—representing USAA's payment on his behalf to Zapata. Balderas-Ramirez challenges this ground in her fourth issue.

Balderas-Ramirez asserts that the payment to Zapata is tantamount to a "gift" to that business because it was not part of any settlement with her, was not otherwise required legally, and was not made in exchange for any consideration from Zapata. She further posits that if Felder can obtain credit for the payment, "an insurance company could send a check to a travel agency for a ticket to Disneyland on behalf of an injured claimant, then later demand full credit for the payment against any settlement." However, Zapata was a secured creditor with rights in the vehicle, and Balderas-Ramirez overlooks uncontroverted summary-judgment evidence that USAA's payment satisfied the entirety of her underlying debt, a debt that she would have otherwise continued to owe despite the collision. That USAA made the payment directly to Zapata rather than to her is ultimately not material to the parties' respective rights because the entirety of the payment, even if

---

[35] However, Balderas-Ramirez's claim for "towing and storage charges," addressed below, ultimately seeks to recover the amount of this offset through indirect means.

15

made to her, would still have been subject to Zapata's security interest.[36]  And while Balderas-Ramirez suggests that USAA failed to comply with certain technical requirements for discharging Zapata's lien,[37] it remains undisputed that the payment satisfied the underlying debt in full.

Ultimately, Balderas-Ramirez seeks an impermissible double-recovery for lost vehicle value for which she had already been compensated when USAA paid off her debt to Zapata.  The trial court did not err in granting summary judgment that she take nothing on that claim.  We overrule her fourth issue.

**"Towing and storage charges"**

In her third issue, Balderas-Ramirez insists that she presented summary-judgment evidence raising a fact issue as to whether she suffered the loss of the $1,700 in "towing and storage charges" she claimed.  She emphasizes the evidence, also relied upon by Felder, reflecting that Pronto had, at least before selling the vehicle for salvage, considered her to owe $150 for towing charges and $1,400 for storage.  The salient point here is that Felder's no-evidence motion placed the burden on Balderas-Ramirez to present evidence that she had suffered loss from these charges.  She did not do so—although there was proof that Pronto had at one time recorded the charges as accruing, she presented no evidence that she ever actually paid them.  On the contrary, Pronto

---

[36]  *See* Tex. Bus. & Com. Code §§ 9.102(65), .203, .309(1), .315, (UCC provisions addressing purchase-money security interests); Tex. Prop. Code §§ 61.002–.004 (statutory lien for motor-vehicle mortgagees).

[37]  *See* Tex. Prop. Code § 61.005 ("If the property to which a lien created under this chapter attaches is paid jointly to the mortgagee and mortgagor, the lien is discharged.").  Contrary to Balderas-Ramirez's view, this provision would appear calculated to ensure notice to the creditor and to protect its interests, as opposed to precluding extinguishment of the lien by paying the full amount of the underlying debt directly to the creditor.

ultimately recouped the charges through the proceeds of its eventual salvage sale of the 4Runner. To the extent Balderas-Ramirez is contending that she suffered the loss through this eventual sale, she has not attempted to demonstrate that she possessed any rights to the vehicle at that juncture in light of Felder's summary-judgment proof that she had abandoned it. The trial court did not err in granting summary judgment that she take nothing on this claim. We overrule Balderas-Ramirez's third issue.

**Loss-of-use damages**

Balderas-Ramirez's remaining issues challenge the trial court's take-nothing summary judgment on her claim for loss-of-use damages. In her sixth issue, she urges that the Texas Supreme Court's *J&D Towing* decision governs this case and opens the door to her recovery of loss-of-use damages despite her 4Runner being totally destroyed. Felder counters that we should apply *J&D Towing* only prospectively, urging that the decision "radically depart[ed]" from "established Texas jurisprudence" that had barred Balderas-Ramirez's recovery and on which he had already relied for over four years before the decision was handed down.

As a general rule, judicial decisions, including those of the Texas Supreme Court, apply "retroactively" to preexisting cases that have not yet been concluded by a final judgment and exhaustion of direct appeals.[38] While acknowledging this general rule, Felder emphasizes that the Texas Supreme Court has made exceptions in some cases and urges that this case warrants such

---

[38] *See Engelman Irrigation Dist. v. Shields Bros., Inc.*, 514 S.W.3d 746, 748–49 (Tex. 2017).

17

treatment under the analysis that court has used.[39] But whatever the merits of Felder's assertion,[40]

he overlooks that it is solely the Texas Supreme Court's prerogative, not ours, to decide whether its

decisions should have only prospective effect.[41] Nothing in the text of *J&D Towing* indicates that

the Texas Supreme Court exercised its discretion to apply the decision only prospectively.[42]

Accordingly, we are bound to apply *J&D Towing* to Balderas-Ramirez's claim for loss-of-use

damages.[43] We sustain her sixth issue.

In her second issue, Balderas-Ramirez urges that she presented legally sufficient

evidence, in response to Felder's no-evidence challenge, to support her claim of loss-of-use damages

accruing from the date of the collision through trial and judgment. To meet this burden, Balderas-

Ramirez points to her "opinion" that the "average rental cost" for a "similar vehicle" in Travis

County "from the date of the crash to now is $80.00 per day," as well as her testimony professing

financial inability to purchase a replacement vehicle previously.

---

[39] *See, e.g.*, *Carrollton Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.*, 826 S.W.2d 489, 515–21 (Tex. 1992) (borrowing factors from *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07 (1971)).

[40] *See id.* at 518–19 (citing, among other considerations, whether the decision "establish[es] a new principle of law . . . by overruling clear past precedent on which litigants may have relief" and "the inequity imposed by retrospective application" (quoting *Huson*, 404 U.S. at 106–07)).

[41] *See Bowen v. Aetna Cas. and Sur. Co.*, 837 S.W.2d 99, 100 (Tex. 1992) (per curiam) ("A decision of the Supreme Court operates retroactively unless this Court exercises its discretion to modify that application."); *Pickett v. Texas Mut. Ins. Co.*, 239 S.W.3d 826, 833 (Tex. App.—Austin 2007, no pet.) ("The decision of whether a supreme court case applies only prospectively lies within the discretion of the supreme court.").

[42] *See generally J&D Towing, LLC*, 478 S.W.3d at 652–78.

[43] *See Pickett*, 239 S.W.3d at 833 (similarly holding that Texas Supreme Court decision applied retroactively in the absence of any contrary indication in that opinion).

18

As the supreme court observed in *J&D Towing*, the prior rule holding loss-of-use damages unrecoverable in a total-destruction case had derived in part from an assumption or legal fiction that the property owner in such instances could replace the property immediately, and thus would not or should not incur loss-of-use damages.[44] Balderas-Ramirez's theory of recovering loss-of-use damages represents an opposite extreme from this premise—her gravamen is that a property owner may recover loss-of-use damages indefinitely, at least if he or she professes financial constraints or some other perceived inability to purchase a replacement. Assuming the $80-per day value she advocates, the theory would yield Balderas-Ramirez loss-of-use damages that had already exceeded $120,000 (and counting) by the time the trial court terminated the effort through summary judgment.

*J&D Towing* does not go this far in expanding recovery of loss-of-use damages. As the Texas Supreme Court emphasized there, the broader rules for ascertaining tort damages, including loss-of-use damages, seek ultimately to ensure "'a fair, reasonable, and proper compensation for the injury inflicted as a proximate result of the wrongful act complained of,'" compensation that is "neither meager nor excessive" in "plac[ing] the plaintiff in the position in which he would have been absent the defendants' tortious act."[45] Loss-of-use damages, it explained, serve specifically to compensate for economic injury, distinct from harm to the property itself, that may result from the deprivation of the property's use during either repairs or "a period reasonably

---

[44] *See J&D Towing*, 478 S.W.3d at 672–73 (noting the "assumption . . . that, in total destruction cases, a plaintiff could immediately replace the destroyed property and, thus, did not suffer any loss-of-use damages").

[45] *J&D Towing*, 478 S.W.3d at 655 (quoting *Pasadena State Bank*, 228 S.W.2d at 128, and citing *Nelson v. Krusen*, 678 S.W.2d 918, 924–25 (Tex. 1984)).

necessary to obtain replacement property," as measured by pecuniary losses (such as lost profits) or

the cost of renting a substitute in the meantime.[46] Such damages, it further observed, "are often

appropriately couched in terms of consequential damages"—i.e., those that do not flow "necessarily"

from the tortious act, as with direct damages, but "must be both foreseeable and directly traceable

to the act."[47] Hence, loss-of-use damages "may not be sustained at all" in a given case.[48] And the

*J&D Towing* court further cautioned:

> Permitting loss-of-use damages in total-destruction cases . . . is not a license for
> unrestrained raids on defendants' coffers. As with all consequential damages, the
> availability of loss-of-use damages is necessarily circumscribed by commonsense
> rules. To begin with, the damages claimed may not be 'too remote.' This is not to
> say they must be 'the usual result of the wrong,' but they must be foreseeable and
> directly traceable to the tortious act. The damages also must not be speculative.
> Although mathematical exactness is not required, the evidence offered must rise
> above the level of pure conjecture. Moreover, the damages may not be awarded for
> an unreasonably long period of lost use. Whether framed as a duty of mitigation or
> a doctrine of avoidable consequences, the principle is the same: A plaintiff may not
> recover loss-of-use damages for a period longer than that reasonably needed to
> replace the personal property. That principle compels a plaintiff's diligence in
> remedying his loss and deters an opportunistic plaintiff from dilly-dallying at the

---

[46] *See id*. at 655–56, 676–77; *see also Luna v. North Star Dodge Sales, Inc.*, 667 S.W.2d 115, 118-19 (Tex. 1984) (describing damages for loss of vehicle's use during repairs as compensation for owner's "inconvenience" and holding that claimant "need not rent a replacement automobile or show any amounts actually expended for alternative transportation," but could rely on proof of "the reasonable rental value of a substitute automobile").

[47] *J&D Towing*, 478 S.W.3d at 655–56 (citing *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007); *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997); *Mead v. Johnson Grp., Inc.,* 615 S.W.2d 685, 687 (Tex. 1981); *Henry S. Miller Co. v. Bynum*, 836 S.W.2d 160, 163–64 (Tex. 1992) (Philips, C.J., concurring); *Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 121 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Airborne Freight Corp., Inc. v. C.R. Lee Enters., Inc.*, 847 S.W.2d 289, 295 (Tex. App.—El Paso 1992, writ denied); 1 Dan B. Dobbs, *Law Of Remedies* § 5.15(1), at 874 (2d ed. 1993)).

[48] *Id.* at 677 n.199.

expense of the defendant. After all, the role of actual damages is to place the plaintiff in his rightful position, not the position he wishes to acquire.**[49]**

Suffice it to say that Balderas-Ramirez's claim for loss-of-use damages—which presumes "a period reasonably necessary to obtain replacement property" exceeding four years and would yield a six-digit award that exceeds twenty times her vehicle's fair market value (sixteen times under her own valuation)—raises some red flags under *J&D Towing*'s reasoning.

And guided by *J&D Towing*, we conclude that Balderas-Ramirez has not raised a genuine issue of material fact with respect to her recovery of loss-of-use damages. We first observe that Balderas-Ramirez presented no evidence that her previous uses of the 4Runner had been anything other than personal in nature—transportation for herself or family members to work, school, visits to friends, and the like—as opposed to pecuniary. Further, the injury or deprivation that would be the basis for Balderas-Ramirez's recovery of loss-of-use damages would not arise from the inability to use a specific vehicle (here, her 4Runner) while awaiting repairs, as in a partial-destruction case, but from the absence of some substitute vehicle adequate for her personal use. Balderas-Ramirez effectively conceded that she suffered no such deprivation until several years had elapsed following the collision.

Immediately following the collision, Balderas-Ramirez testified, she ceased driving altogether for a period of time, citing fear or "trauma" from the collision. While perhaps implicating harm compensable in personal-injury damages (and, in this case, already foreclosed through her

---

**[49]** *Id*. at 677 (citing *Arthur Andersen*, 945 S.W.2d at 816; *White v. Southwestern Bell Tel. Co., Inc.,* 651 S.W.2d 260, 262 (Tex. 1983); *Bynum*, 836 S.W.2d at 164 (Philips, C.J., concurring); Dobbs, *Law Of Remedies* (2d) § 5.15(1), at 875)).

21

settlement), this evidence negates any deprivation compensable in loss-of-use damages.[50] Thereafter, when she eventually began driving, for purposes she described as personal, Balderas-Ramirez acknowledged that she had use of a "truck" provided by her then-husband. Although she stresses her characterization that the vehicle was "loaned" by her then-husband, Balderas-Ramirez presented no evidence that this asserted status caused her any deprivation with respect to her vehicle use as compared to either her 4Runner or a permanent replacement.[51]

Balderas-Ramirez does not identify any actual deprivation of vehicle use until her husband took back the truck upon the couple's divorce—an event she places in December 2015, roughly four years after the collision. Her summary-judgment evidence failed to raise a fact issue (if not negated conclusively) that such a remote claimed deprivation of use could be considered "directly traceable" to the collision or within any period "reasonably needed to replace the personal property."[52] Rather, the record bespeaks a lack of diligence that is also reflected in the intervening near-dismissal of her lawsuit for want of prosecution. We would also note that Balderas-Ramirez acknowledged that she had returned to work by late 2015, earning $300 per day as a photographer, yet offered no explanation as to why or how her professed financial inability to acquire a permanent replacement vehicle previously, which she had attributed to her being unable to work, would have continued to exist at the later juncture.

---

[50] The same would arguably be true of Balderas-Ramirez's professed financial inability to purchase a replacement vehicle, which she attributed to an inability to work for several years due to pain—ultimately a complaint of lost wages resulting from her personal injuries.

[51] Nor is there any claim for expenses or other loss associated with the husband's provision of the truck to Balderas-Ramirez in lieu of other uses of that vehicle.

[52] *See id*.

22

This Court's 1997 *Mondragon* decision does not dictate any contrary conclusion.[53] That decision, which arose from an automobile collision that was deemed to render a vehicle inoperable but repairable (and thus opening the door to loss-of-use damages under the prevailing rule at the time), did uphold implied findings awarding loss-of-use damages through time of trial—a period exceeding two years—where the plaintiff vehicle owner presented evidence that he had been financially unable to repair the vehicle throughout that period.[54] The Court rejected the defendant's arguments that the period of recovery should be capped at two weeks (the period in which the car could have been repaired) under an "objective reasonableness" standard, instead reasoning essentially that the financial constraints precluding repairs were an "eggshell plaintiff"-type characteristic for which the defendant bore the risk and responsibility.[55] The Court similarly deemed of no moment that the loss-of-use-damages award exceeded twice the value of the vehicle in question.[56] To the extent *Mondragon* survives *J&D Towing*, it is distinguishable. Among other

---

[53] 954 S.W.3d 191.

[54] *See id*. at 192–95.

[55] *See id*. at 194 ("If we were to limit Austin's loss of use award to two weeks, we would be penalizing him for his lack of financial resources, denying him recovery of the damages he suffered because of Mondragon's negligent act and allowing [Mondragon's] insurance company to reap the benefits of its refusal to pay the meritorious claim. The law does not permit or require such a result. . . .[A] tortfeasor takes the plaintiff as he finds him." (citing *Coates v. Whittington*, 758 S.W.2d 749, 752 (Tex. 1988)), 195 ("That Mondragon happened to collide with a car whose owner did not have surplus disposable income does not absolve him of responsibility for the consequences of his negligent act.").

[56] *See id*. at 195–96 ("[A] person whose car is only partially damaged suffers damage in addition to loss of value of the car. The person also suffers loss of *use* of the car, a value not necessarily correlative to the value of the *car*."); *see also id.* at 193 (finding evidence sufficient to support loss-of-use damages award of $8,020 where vehicle's fair market value at time of collision was $3,400).

things, the *Mondragon* plaintiff, unlike Balderas-Ramirez, presented evidence of actual deprivation of vehicle use throughout the period in question,[57] as well as evidence that his financial inability to afford repairs had actually continued through time of trial.[58] But more critically, the Texas Supreme Court in *J&D Towing*, unlike the *Mondragon* Court, explicitly adopted an objective-reasonableness standard for determining the period for which loss-of-use damages can be recovered, at least in total-destruction cases like this one—"[a] plaintiff may not recover loss-of-use damages for a period longer than that reasonably needed to replace the personal property."[59] This standard, the high court emphasized, is calculated to "compel[] a plaintiff's diligence in remedying his loss and deter[] an opportunistic plaintiff from dilly-dallying at the expense of the defendant."[60] Balderas-Ramirez has failed to raise a fact issue under this standard.

As a final observation, Balderas-Ramirez's burden with respect to loss-of-use damages is, in practical effect, to raise a fact issue not merely as to whether she incurred some amount of those damages, but as to whether she incurred some amount greater than the credits Felder

---

[57] *See id*. at 192 (noting that Austin "had to continue making payments on the car, send additional money to his daughter [for whose use he had purchased the car] for transportation at college, and travel six-hundred miles each way to transport her back and forth on holidays").

[58] *See id*. at 196 ("Austin testified that he could not drive the car and had no money to repair or replace the car from the time of the collision even until the time of trial.").

[59] *See J&D Towing*, 478 S.W.3d at 677.

[60] *Id*. This distinction would be consistent with recognition that plaintiffs in a total-destruction case, while not universally able to replace their vehicles immediately, as had previously been assumed, will nonetheless tend to have greater control over the length of the intervening delay than would plaintiffs awaiting repairs of a damaged vehicle. *See id*.; *cf. Luna*, 667 S.W.2d at 119 (holding, in repairable-vehicle case, that "[t]he period of compensatory loss of use will be the amount of time the plaintiff was deprived of the loss of use of the automobile" while awaiting repairs).

may claim for the prior payments made on his behalf by USAA. These credits include not only the $927.75 of the Zapata payment that remained after being applied against Balderas-Ramirez's recoverable market-value damages, but also USAA's further payment of $241.15 explicitly for loss-of-use damages. Although Balderas-Ramirez disputes in her fifth issue that the latter payment sufficed as an accord and satisfaction of her entire loss-of-use-damages claim, she acknowledges that the payment amount should properly be credited against any recovery she would obtain. The two credits total $1,168.90, which would translate into roughly 14 ½ days of non-use at the $80 per-day rental rate that Balderas-Ramirez advocates. Even if Balderas-Ramirez had otherwise raised a fact issue as to some recovery of loss-of-use damages, we could not conclude this amount would exceed the $1,168.90 in payments through which she has already been compensated.

Accordingly, we overrule Balderas-Ramirez's second issue. And because this holding is singularly sufficient to uphold the trial court's take-nothing summary judgment as to loss-of-use damages, we need not reach Balderas-Ramirez's fifth issue, her challenge to the accord-and-satisfaction ground.[61]

## CONCLUSION

We affirm the trial court's summary judgment.

_____
Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Goodwin

---

[61] *See* Tex. R. App. P. 47.1.

25

Affirmed

Filed:   November 21, 2017