# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-24-00088-CV

**Bekins Van Lines, Inc. and Willis Permian Movers, Inc., Appellants**

**v.**

**Sherwin Kahn, Appellee**

### FROM THE COUNTY COURT AT LAW NO. 2 OF WILLIAMSON COUNTY
### NO. 21-1090-CC2, THE HONORABLE LAURA B. BARKER, JUDGE PRESIDING

## O P I N I O N

Sherwin Kahn sued Bekins Van Lines, Inc. and Willis Permian Movers, Inc. (collectively, Appellants) for damages to his motorcycle sustained in a residential move. Appellants appeal the trial court's judgment, which awarded Kahn $58,457.98 in damages and $65,307.90 in attorney's fees, following a bench trial. We reverse the portion of the judgment awarding Kahn loss-of-use damages, as well as the pre-judgment interest on that award, and render judgment that Kahn take nothing on his loss-of-use damages claim. We also reverse the judgment to the extent that it determines Willis is liable for negligence. We otherwise affirm the judgment.

## BACKGROUND

Kahn is a retired chiropractor who lived in Williamson County for several years before deciding to return to Muskogee, Oklahoma in fall 2020. In planning his move, Kahn alleges that he met with a Bekins representative to discuss the possibility of moving his household goods

and, in particular, his 2009 Can-Am Spyder GS SE5 motorcycle. According to Kahn's testimony at trial, the Bekins sales representative assured him that Bekins "had the capability and experience to do that." Kahn emphasized how important the motorcycle was to him, saying that he "hate[d] to admit how important it was" and it "helped renew [his] spirit." Since purchasing the motorcycle, Kahn had added many accessories and features to "personalize it" because in 2009, there were not "factory options" for accessories like there are today. He characterized the motorcycle's condition before the move as "pristine."

Bekins provided two options for protecting Kahn's possessions during the move: Full Replacement Value Protection or Waiver of Full Replacement Value Protection. Kahn selected Full Replacement Value Protection with no deductible. Its terms, as stated on Bekins' bill of lading, provided:

> Full (Replacement) Value Protection is the most comprehensive plan available for protection of your goods. If any article is lost, destroyed, or damaged while in your mover's custody, your mover will, at its option, either: 1) repair the article to the extent necessary to restore it to the same condition as when it was received by your mover, or pay you the cost of such repairs; or 2) replace the article with an article of like kind and quality, or pay you the cost of such a replacement. Under Full (Replacement) Value Protection, if you do not declare a higher replacement value on this form prior to the time of shipment, the value of your goods will be deemed to be equal to $6.00 multiplied by the weight (in pounds) of the shipment, subject to a minimum valuation for the shipment of $6,000. . . . If you wish to declare a higher value for your shipment than the default amounts, you must indicate that value here.

Bekins' brochure detailing its Full Replacement Value Protection plan, which was admitted as an exhibit at trial, states that "[c]laim settlements are based on the repair or replacement cost with no depreciation applied, subject to any applicable deductible," and "[i]f an item cannot be repaired, or is lost in transit, settlement will be based on the replacement cost of an item of like kind and quality." Based on these terms, Kahn increased the total valuation of his household goods

2

from the base value on the form to $50,000 because of the motorcycle and the maximum reimbursement that he understood would be necessary to replace it if it was damaged beyond repair during the move.[1]

Kahn's move did not go as planned. He testified that moving day was "a little dubious from the beginning" because the movers who arrived did not know about his motorcycle and did not have the capacity or equipment to move it. Kahn testified that a Bekins representative instead offered to send a new mover out—whom he was assured "knew how to move vehicles"—the following day. When that mover arrived the next day, Kahn testified that "[the mover] had set up three ramps, very steep ramps on the edge of the truck, . . . the deck of the truck" with "a piece of metal that lapped over." Kahn testified that he told the mover "it doesn't look safe," but the mover "indicated that he knew exactly what he was doing," so Kahn "just deferred to [the mover's] supposed expertise." As Kahn attested, the mover said he did not know how to ride the motorcycle, so he instructed Kahn "to line up the bike" and "go up the ramps into the truck." Kahn "asked him more than once, is this safe, because it didn't feel safe," and he was worried that "this bike could flip on me." When Kahn "tried to ride up the ramps," "the middle ramp blew out and the bike dropped on the knife edge of the moving van," and "the tail of the bike smashed into the ground," though "fortunately it did not flip." Afterwards, the truck's driver "pushed the bike off, so it fell from the truck again down to the ground, and bounced." Kahn testified that he was "obviously very distraught, because [he] couldn't be sure but [he] thought this was catastrophic damage to the bike, at the time."

---

[1] Kahn's statement of claim for damaged goods on the form estimated the motorcycle's weight at 650 pounds, which amounts to a base value of $3,900.

3

Kahn attempted to remedy the issue through Bekins' claims process. He testified that he immediately called the representative with whom he had been communicating to coordinate the move, who told Kahn to fill out a claims form, which included an amount claimed field, "to start the process."[2] Kahn later testified that because he "didn't know what number to choose," he "just chose a number, 10,000," "at random." Kahn stated that he "wasn't claiming 10,000" in loss, and he had been clear with the representative that he "had no idea what the value of the motorcycle was" or "what a replacement motorcycle would be." And Kahn emphasized that he "simply put what [he] thought was a placeholder number at the end of a very stressful day because [he] was told to do so."

After the motorcycle was evaluated, the mechanic informed Kahn "that the frame was bent" and "there's nothing that can be done for it." Bekins later mailed Kahn a $9,905 check and offered Kahn two options: either let Kahn keep the motorcycle, deposit the $9,905 check, and return $4,952.50 for the value of the damaged motorcycle, or let Bekins take the damaged motorcycle and let Kahn keep the entire $9,905. But Kahn testified that he "couldn't even probably buy a decent used" motorcycle for that amount, let alone "enough to replace the motorcycle," information which he maintains he conveyed to a Bekins representative to no response. Steven Burns, general counsel for the Wheaton Group (Bekins' parent company), testified that Bekins came up with the $9,905 figure after reviewing the motorcycle's appraisal (not in evidence at trial), conducting internet research, and having conversations "with all the people involved in this incident" to "come up with a like and kind quality, fair offer to Dr. Kahn." Based on that research,

---

[2] Steve Burns, general counsel for the Wheaton Group (Bekins' parent company), testified that Kahn actually spoke with a representative affiliated with Willis, which he described as "our agent for interstate transportation and storage of household goods."

4

and because Burns "was not yet convinced it could not be repaired," Burns stated that Bekins "took the high end of the range and made sure it had the add-ons, like the turbocharger . . . [a]nd that's how we came up with the high end of the range of possible numbers to repair and replace with like kind and quality." But Burns acknowledged that Bekins assumed repair "was a viable option" and "had in mind Dr. Kahn's request for $10,000."

Kahn did not accept either of Bekins' offers. Instead, in March 2021, Kahn sent Bekins a demand letter for $25,268 for the replacement cost of a motorcycle and $1,500 in attorney's fees. After Kahn did not receive a response, he filed this lawsuit in July 2021, asserting Deceptive Trade Practices Act (DTPA) and breach of contract claims against Bekins, strict liability under the Carmack Amendment, *see* 49 U.S.C. § 14706, against Bekins and Willis, and in the event the trial court determined that the Carmack Amendment does not apply, negligence against Willis for improper handling and loading of the motorcycle. While this litigation proceeded, in January 2023, Kahn purchased a new 2022 Spyder RT Limited motorcycle for $31,538.57, which he testified was "as close as I could get" to his old motorcycle.

The trial court held a pre-trial hearing on Bekins' motion for summary judgment, which it denied, and Kahn's motion to strike Bekins' expert witness, which it granted. The bench trial occurred on November 3, 2023. Admitted exhibits included the bill of lading, Bekins' brochure describing its full value replacement plan, the sales invoice for Kahn's replacement motorcycle, billing records supporting Kahn's attorney's fees claim, Kahn's statement of claim, and photos of the damaged motorcycle. Witnesses included Kahn, Burns, and James Little, Bekins' struck expert witness, who instead briefly testified as a lay witness to his impressions of the damaged motorcycle during his examination.

5

The trial court held a separate hearing to enter judgment on November 9, at which it explained the reasoning for its ruling in detail and committed that ruling to a final judgment. The trial court found in favor of Kahn against Appellants, ordering that Kahn recover from Appellants, "jointly and severally, the sum of $58,457.98 for his actual damages," which it described as $29,228.99 in replacement value for the motorcycle and $29,228.99 in loss-of-use damages. The trial court stated on the record that it did not find a DTPA violation. The trial court also ordered that Kahn recover from Bekins $65,307.90 in attorney's fees through trial, as well as conditional appellate attorney's fees. The judgment included a $12,973.67 award of pre-judgment interest on actual damages, as well as post-judgment interest. This appeal followed.

## STANDARD OF REVIEW

In an appeal from a bench trial, we subject the trial court's findings of fact to the same standards of review applied to jury verdicts. *Austin JSB, Ltd. v. Otwell Realty, Ltd.*, No. 03-22-00459-CV, 2023 WL 5311524, at *3 (Tex. App.—Austin Aug. 18, 2023, pet. denied) (mem. op.) (citing *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996)). When a trial court does not file findings of fact, we assume it made all findings in support of the judgment. *Pharo v. Chambers County*, 922 S.W.2d 945, 948 (Tex. 1996). We "defer to the trial court's findings of fact—so long as they are supported by the record—and review conclusions of law de novo." *Austin JSB*, 2023 WL 5311524, at *3 (quoting *Southwestern Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 683 (Tex. 2020)).

When an appellant challenges the legal sufficiency of the evidence supporting an adverse finding, appellate courts consider only the evidence and inferences, when viewed in their most favorable light, that tend to support the finding and disregard all evidence and inferences to

6

the contrary. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex. 1994). When, as here, the appellant challenges an issue on which it did not have the burden of proof at trial, it must demonstrate on appeal that there is no evidence to support the trial court's adverse findings. *Affordable Power, L.P. v. Buckeye Ventures, Inc.*, 347 S.W.3d 825, 830 (Tex. App.—Dallas 2011, no pet.) (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983)). Under a no-evidence standard of review, we consider the evidence in the light most favorable to the verdict and indulge all reasonable inferences in its support. *Id.* (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)). "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827.

When an appellant challenges the factual insufficiency of the evidence, appellate courts must consider all the evidence and set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). The trial court, as trier of fact and the sole judge of the credibility of the witnesses, is free to draw its own deductions from all the evidence and is not bound by the testimony of any witness. *Sieber & Calicutt, Inc. v. La Gloria Oil & Gas Co.*, 66 S.W.3d 340, 347 (Tex. App.—Tyler 2001, pet. denied); *see Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004). The trial court's findings are binding unless they are supported by no evidence or so against the great weight of the evidence as to be manifestly unjust. *Sieber & Calicutt*, 66 S.W.3d at 347. We will uphold the trial court's judgment so long as it can be sustained on any legal theory supported by the evidence. *Austin JSB*, 2023 WL 5311524, at *3 (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002)).

7

**DISCUSSION**

Appellants present three issues on appeal, which we reorder for clarity. First, they contend that the trial court committed reversible error by failing to file findings of fact and conclusions of law. Second, they contend that some of the trial court's legal conclusions were erroneous, including (a) whether replacement with "like kind and quality" requires replacement with a new motorcycle, and if so, whether sufficient evidence supported the amount awarded here, (b) whether attorney's fees are recoverable for the Carmack Amendment claim, and (c) whether federal law preempts state-law claims against Willis. Finally, Appellants challenge the sufficiency of the evidence supporting the trial court's judgment as to Willis' negligence and the amount awarded to Kahn for his loss-of-use damages.

## I. Whether the trial court's failure to issue findings of fact and conclusions of law is reversible error

Appellants challenge the trial court's failure to issue findings of fact and conclusions of law after they timely filed a request and after they gave notice of past due findings of fact and conclusions of law. Appellants contend that they have presented their arguments on appeal based on implied findings, but "alternatively request the Court to direct the trial court to file the missing factual findings in the event there is uncertainty Appellants cannot overcome."[3] But Appellants admit that "[t]he trial court's error in failing to file findings of fact might not prove harmful here" if the record affirmatively shows they suffered no harm. And Appellants have not explained how they were prevented from properly presenting the case to this Court on appeal or

---

[3] Appellants did not request that we abate this appeal and remand the case to the trial court for the execution of findings of fact and conclusions of law. *See* Tex. R. App. P. 44.4.

any way in which they have had to "guess the reasons for the trial court's adverse ruling." *See Culver v. Culver*, 360 S.W.3d 526, 538 (Tex. App.—Texarkana 2011, no pet.).

Though Appellants properly requested and preserved their request for the trial court to issue findings of fact and conclusions of law, it is apparent from the face of the record that they suffered no harm from the trial court's failure to do so, such that the trial court's error is not reversible error. *Id.* In this context, error is harmful if it prevents an appellant from properly presenting his case to the appellate court. *Tenery v. Tenery*, 932 S.W.2d 29, 30 (Tex. 1996). The test for harm focuses on whether the reasons for the trial court's ruling are obvious from the record. *Hamlett v. Commission for Lawyer Discipline*, No. 07-16-00256-CV, 2016 WL 6242821, at *1 (Tex. App.—Amarillo Oct. 24, 2016, no pet.) (mem. op.) (citing *Sheldon Pollack Corp. v. Pioneer Concrete of Tex., Inc.*, 765 S.W.2d 843, 845 (Tex. App.—Dallas 1989, writ denied)). When the trial court's reasons for its judgment are apparent from the record, the presumption of harm is rebutted. *Id.* (citing *Landbase, Inc. v. Texas Emp. Comm'n*, 885 S.W.2d 499, 502 (Tex. App.—San Antonio 1994, writ denied)).

Here, the trial court announced its reasons for its ruling in open court, including the specific evidence it considered in calculating damages for replacement value and loss-of-use, its reasoning for granting loss-of-use damages, and that it was denying Kahn's DTPA claim. Its reasons for its judgment are thus apparent from the record, and the presumption of harmful error is rebutted. *See Culver*, 360 S.W.3d at 538 (holding no reversible error in trial court's failure to file findings of fact and conclusions of law when it announced reasons for its ruling on record in open court and collecting cases doing same). We overrule Appellants' first issue.

## II.   Whether the challenged legal conclusions are error

Appellants maintain that the trial court erred by making the following conclusions of law: (1) that a new 2022 Spyder motorcycle was of "like kind and quality" to Kahn's 2009 damaged motorcycle such that $29,228.99 is an appropriate measure of damages and supported by sufficient evidence; (2) that attorney's fees are warranted; and (3) that Willis did not establish the negligence claim is preempted by federal law.[4]

### a.   Replacement quality and amount of damages

Appellants argue that the trial court erred in determining that replacement with an item of "like kind and quality" permitted Kahn's damaged motorcycle to be replaced with a new one. Appellants urge that the parties' intent as expressed in the bill of lading was "something other than replacement with new," and thus the trial court erred by failing to give effect to that operative language. While Appellants agree that the bill of lading prohibits factoring in depreciation, they maintain that the value of a 2009 Spyder motorcycle is the appropriate measure of damages, not a brand-new 2022 model. Consequently, Appellants argue that there is insufficient evidence to support the $29,228.99 replacement cost awarded to Kahn under his Carmack Amendment claim.

The Carmack Amendment is "a federal transportation statute that creates a uniform federal law regarding the liability of interstate carriers for lost or damaged goods." *Celadon Trucking Servs., Inc. v. Titan Textile Co.*, 130 S.W.3d 301, 303 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (citing 49 U.S.C. § 14706). "The Carmack Amendment subjects a motor carrier

---

[4] The trial court expressly stated the first two conclusions on the record. As to the third, neither the judgment nor the trial court's on-the-record ruling specifically referenced the negligence claim against Willis. Thus, we construe Appellants' issue on appeal as challenging the trial court's implied conclusion that Willis was negligent.

transporting cargo in interstate commerce to absolute liability for 'actual loss or injury to property.'" *Tallyho Plastics, Inc. v. Big M Constr. Co.*, 8 S.W.3d 789, 792 (Tex. App.—Tyler 1999, no pet.) (citing *Missouri Pac. R.R. v. Elmore & Stahl*, 377 U.S. 134, 137 (1964)). "The Supreme Court has construed actual loss or damage broadly: 'The words of the statute are comprehensive enough to embrace all damages resulting from any failure to discharge a carrier's duty with respect to any part of the transportation to the agreed destination.'" *BINL, Inc. v. United States*, 106 Fed. Cl. 26, 40 (2012) (quoting *Southeast Express Co. v. Pastime Amusement Co.*, 299 U.S. 28, 29 (1936)).

"The Carmack Amendment unambiguously imposes the risk of error on one particular party, the carrier, to the exclusion of the other party, the shipper." *National Polymer Int'l Corp. v. FedEx Freight, Inc.*, No. 4:16-CV-00359, 2017 WL 3537324, at \*5 (E.D. Tex. Aug. 17, 2017) (citing 49 U.S.C. § 14706(c) and *ABB Inc. v. CSX Transp., Inc.*, 721 F.3d 135, 145 (4th Cir. 2013)). "By limiting a carrier's liability to the actual loss or injury to the transported property, Congress intended to provide certainty to both shippers and carriers, and to enable carriers to assess their risks and predict their liability for damages." *Tallyho Plastics*, 8 S.W.3d at 792 (citing *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407, 1415 (7th Cir. 1987)). "A shipper establishes its prima facie case under the Carmack Amendment when it shows delivery of the goods to the carrier in good condition, arrival in damaged condition, and the amount of damages." *Pacific Indem. Co. v. Pickens Kane Moving & Storage Co.*, 655 F. Supp. 2d 1023, 1026 (D. Ariz. 2009), *aff'd sub nom. Pacific Indem. Co. v. Atlas Van Lines, Inc.*, 642 F.3d 702 (9th Cir. 2011) (citing *Missouri Pac. R.R.*, 377 U.S. at 138).

The Carmack Amendment permits carriers to offer shippers two liability options: a "released rate" option, which values items at only $.60 per pound but offers a lower shipping

11

rate, and "full value protection," at issue here, under which the shipper declares a total value of the shipped goods, and in case of loss or destruction to any items in the shipment, the carrier must pay "the 'replacement value' of goods comparable to those lost or destroyed, up to the *declared value of the shipment*," in exchange for a higher shipping rate. *BINL*, 106 Fed. Cl. at 41 (citing *Released Rates of Motor Common Carriers of Household Goods*, No. RR 999 (AMEND5), 2011 WL 192635, at *2 (S.T.B. Jan. 19, 2011), decision clarified, Fed. Carr. Cas. (CCH) ¶ 37364 (S.T.B. Jan. 10, 2012)). Since Congress's 2005 amendment to the Carmack Amendment, full value protection has been "the default liability option for interstate movement of household goods," effectively changing the full protection level for interstate carriers from "actual loss or injury"—which traditionally meant the depreciated value of household goods—to "replacement value." *Id.* at 40–41; *see* 49 U.S.C. § 14706(f)(2) ("Unless the carrier receives a waiver in writing . . . a carrier's maximum liability for household goods that are lost, damaged, destroyed, or otherwise not delivered to the final destination is an amount equal to the replacement value of such goods, subject to a maximum amount equal to the declared value of the shipment and to rules issued by the Surface Transportation Board and applicable tariffs."); *Released Rates of Motor Common Carriers of Household Goods*, No. AMEND 4, 2007 WL 1696988, at *1 (S.T.B. June 11, 2007). Replacement value is "a higher liability standard" than actual loss. *Pacific Indem.*, 655 F. Supp. 2d at 1027.

The parties here agree that the Carmack Amendment applies (at least as to Bekins), that Kahn selected full replacement value protection, and that Kahn declared a $50,000 total value for his shipment. However, Appellants contend that full replacement value protection "does not

require replacement with new," such that the trial court erred by concluding Bekins must reimburse Kahn for his purchase of a 2022 motorcycle and awarding Kahn $29,228.99 in replacement costs.[5]

While full replacement value is not expressly defined by the Carmack Amendment, the Surface Transportation Board, the federal agency charged with the economic regulation of various modes of surface transportation,[6] expressly authorizes replacement with new. *See Released Rates of Motor Common Carriers of Household Goods*, 2007 WL 1696988, at *1. The Surface Transportation Board states that "Congress changed the statutorily prescribed, standard cargo liability of [household goods] carriers from the actual (i.e., depreciated) value of lost or damaged goods to the replacement value of the goods, up to the pre-declared total value of the shipment, unless the shipper waives in writing that level of protection," such that the default liability of a household goods carrier "is now the replacement value of the goods." *Id.* As an example, the amendment provides that "the value of a comparable new television to replace a used television that was lost in a household move, rather than the depreciated value of the used television," is an appropriate "replacement value of the goods." *Id.*; *BINL*, 106 Fed. Cl. at 42–43. The Surface Transportation Board previously issued an agency decision similarly characterizing the full value protection option as potentially "cover[ing] more than the 'actual' value of household goods because it provides for replacing a lost or damaged item (which usually has been used) with

---

[5] The trial court stated on the record that it omitted certain items from this calculation, which reduced the damages award from Kahn's purchase price of $31,538.57 to $29,228.99. Specifically, the trial court's calculation includes the base price of $28,999.00 and the $229.99 accessory listed, but not the various remaining fees, including the warranty for the motorcycle and freight charges.

[6] *See* 49 C.F.R. § 375.103 (defining "Surface Transportation Board"); *BINL, Inc. v. United States*, 106 Fed. Cl. 26, 40 n.10 (2012) (noting that Congress has given the Surface Transportation Board "jurisdiction over most rate regulation").

13

a new, replacement item." *Released Rates of Motor Common Carriers of Household Goods*, 5 S.T.B. 1147, 2001 WL 1637941, at *6 (S.T.B. Dec. 18, 2001). Based on this clear guidance, we cannot agree with Appellants' position that replacement value must mean "something other than new."

The documents that Appellants urge compel otherwise—the bill of lading and Bekins' brochure describing its full replacement value protection plan—are consistent with this conclusion. For example, Bekins' "This is Valuation" brochure states that full replacement value protection plans "ensure your belongings are covered for repair, replacement or reimbursement against loss or damage for up to 100 percent of their current retail value – without depreciation." It continues that "[t]he maximum reimbursement is the shipment value you declare after sign-off on the Bill of Lading with your professional driver," and it concludes by stating "[n]o one can tell you how much your personal belongings are worth. Bekins puts the power of Full Replacement Value Protection in your hands."

Burns's deposition testimony (admitted as an exhibit at trial) aligns with this conclusion, too. When Burns was asked about how Bekins determines replacement cost without factoring in depreciation, he testified: "Our obligation, as I understand it . . . is to replace it with a functional equivalent if we can't repair it or – at our choice, not necessarily to spend $3,000 on a television if that's what it cost 10 years ago." Burns clarified that "if someone breaks a 10-year-old plasma [television], or maybe it was LCD, that thing probably cost those folks thousands of dollars a decade ago but could be replaced today for three or 400."

The full value replacement standard is thus necessarily dependent on the facts. And in a bench trial, "[t]he trial court is the 'sole judge of the credibility of the witnesses and the weight to be given their testimony.'" *Seasha Pools, Inc. v. Hardister*, 391 S.W.3d 635, 639 (Tex. App.—

14

Austin 2012, no pet.) (quoting *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986)). As factfinder, the trial court may believe one witness, disbelieve others, and resolve inconsistencies in any testimony. *McGalliard*, 722 S.W.2d at 697.

Here, though Burns disputed the conclusion that the motorcycle could not be repaired, there was sufficient evidence supporting the trial court's implied conclusion that the damage was irreparable and thus a replacement was necessary. Kahn testified that he had the damaged motorcycle evaluated by a mechanic who told him "that the frame was bent" and "there's nothing that can be done for it" because there is no way to repair a composite frame motorcycle. He also testified about speaking with people "directly involved with Can-Am" who told him "it wasn't repairable" and trying to replace the frame "would be a tremendous mistake" and "would always cause problems with electrical system failures later" because "the frame begins to take on the characteristics of the bike they're in." Thus, the trial court could have reasonably concluded that the first of the two options in full replacement value protection—i.e., that Bekins could "repair the article to the extent necessary to restore it to the same condition as when it was received by your mover, or pay you the cost of such repairs"—was unavailable because the motorcycle could not be repaired.

That left the alternative full replacement value protection option: "replace the article with an article of like kind and quality, or pay you the cost of such a replacement." Kahn also presented evidence that the replacement motorcycle constitutes a replacement of "like kind and quality" to his damaged motorcycle. For example, Kahn testified that after purchasing his 2009 motorcycle, he added many accessories and features to "personalize it" because when he bought that model, there were not "factory options" for accessories like there are today. But he characterized its condition before the move as "pristine."

15

When shopping for a new motorcycle, Kahn testified that "there were two models" available at the dealership, and after examining both options, he determined that the RT model was "as close as [he] could get" to his old motorcycle. He acknowledged that there were differences between the two models, including that "all the newer bikes are somewhat larger" and "[e]verything you would have wanted on the '09 [he] did mostly on [his] own, aftermarket" but that those options are "now included from the factory." Specifically, Kahn testified:

> The difference between the '09 and the 2022 is that there are no options. Everything you would have wanted on the '09 I did mostly on my own, aftermarket, is now included from the factory. The factory learned that that's what people wanted and they basically raised the price – as you know, how motorcycles go up in price. They raised the price and they included all the optional extras that most people were doing to their bikes anyhow. Like better shocks, cruise control, which you could do aftermarket in the old days. Better lights, all of that kind of stuff. So it's basically new and improved in the sense that it now incorporates all the things that everybody was doing to their bikes back in '09.

Given Kahn's testimony and the applicable standard of review, there was sufficient evidence to support the trial court's implied conclusion that the new motorcycle is comparable, or of like kind and quality, to Kahn's old motorcycle that Bekins damaged in the move. *See BINL*, 106 Fed. Cl. at 41; *cf. Webster v. RTK Enters. of Columbus, LLC*, No. 2:22-CV-3708, 2025 WL 887459, at *3–4 (S.D. Ohio Mar. 21, 2025) (granting summary judgment in carrier's favor when shipper provided "no admissible evidence of the actual value" but relied instead solely on declared value of damaged painting). Finally, Kahn presented undisputed evidence of the replacement motorcycle's purchase price through his testimony and the invoice for the motorcycle admitted in evidence, and the amount awarded by the trial court for replacement value is less than Kahn's maximum declared value of $50,000, such that it does not conflict with the Carmack Amendment's limitation of liability. *See* 49 U.S.C. § 14706(f).

16

Because the trial court did not err in concluding that a new motorcycle is "comparable" or of "like kind and quality" to suffice as a replacement for Kahn's damaged motorcycle under the Carmack Amendment, and because sufficient evidence supported the trial court's award of $29,228.99 in replacement costs, we overrule Appellants' issue on this point.

### b. Attorney's fees

Appellants also challenge the trial court's award of attorney's fees against Bekins under the Carmack Amendment. Appellants maintain that attorney's fees are not recoverable here because the statutory predicates for an attorney's fee award under the Carmack Amendment were not met.

"[A]ttorney's fees authorized by federal law are available in Carmack Amendment actions, provided that certain conditions are satisfied." *Arnold v. Allied Van Lines, Inc.*, No. SA-21-CV-00438-XR, 2022 WL 2392875, at *16 (W.D. Tex. July 1, 2022) (citing 49 U.S.C. § 14708(d)). If the shipper timely submits her claim to the carrier and prevails in "any court action to resolve a dispute between a shipper of household goods and a carrier providing transportation or service subject to jurisdiction under subchapter I or III of chapter 135 concerning the transportation of household goods by such carrier, the shipper shall be awarded reasonable attorney's fees" so long as one of the listed three conditions is met, including as relevant here, that "the shipper was not advised by the carrier during the claim settlement process that a dispute settlement program was available to resolve the dispute." 49 U.S.C. § 14708(d).

Kahn sought attorney's fees under this option, maintaining that Bekins never informed him of the availability of an alternative dispute resolution process after he submitted his claim. Appellants contend that Kahn was advised during the claim settlement process that

arbitration was available because before his move, they provided him with a booklet titled "Rights and Responsibilities When You Move," and at trial, Appellants also pointed to an email sent by its claims adjuster, in which she referred Kahn to the electronic version of these policies during communications about his claim. Because Section 14708(d) requires the carrier to advise the shipper that a dispute settlement program was available "during the claim settlement process," the evidence of the booklet being provided to Kahn before the move does not establish notice to Kahn during the relevant time period, and it is undisputed that the website which Bekins says its representative sent in a link to Kahn is not in the record. In other words, there is no evidence in the record that Bekins informed Kahn during the claim settlement process that a dispute settlement program was available to resolve the dispute.

Appellants also argue that attorney's fees are not available here because the claim involves a motorcycle, which they argue is not a "household good" under the statute. *See* 49 U.S.C. § 131062(10). "Household goods" is defined as:

> The term "household goods", as used in connection with transportation, means personal effects and property used or to be used in a dwelling, when a part of the equipment or supply of such dwelling, and similar property if the transportation of such effects or property is (A) arranged and paid for by the householder, except such term does not include property moving from a factory or store, other than property that the householder has purchased with the intent to use in his or her dwelling and is transported at the request of, and the transportation charges are paid to the carrier by, the householder; or (B) arranged and paid for by another party.

*Id*. Appellants point to two federal district court cases involving the interstate transportation of and damage to motor vehicles, in which the courts noted that attorney's fees were not available under Section 14708(d) because the vehicles were not household goods. *See Steiner v. Reliable Carriers, Inc.*, No. CV 10-3981 GAF (AJWx), 2010 WL 11598069, at *1 (C.D. Cal. Aug. 23, 2010) (granting motion to strike request for attorney's fees under Fed. R. Civ. P. 12(f)

18

in suit asserting Carmack Amendment claim); *Mosso v. Dependable Auto Shippers, Inc.*, No. 1:07-cv-00005-OWW-NEW, 2007 WL 2746723, at *5–6 (E.D. Cal. Sept. 19, 2007) (denying motion to dismiss attorney's fees request under Fed. R. Civ. P. 12(b)(6) based on attorney's fees provision in bill of lading but opining that "an automobile is not a household good" in context of Section 14708 request for attorney's fees).

But those cases are distinguishable because neither involved "the transportation of household goods." *See* 49 U.S.C. § 14708(d). In both *Steiner* and *Mosso*, the shipper hired a carrier to move only a motor vehicle. *See Steiner*, 2010 WL 11598069, at *1 (noting plaintiffs commissioned defendant to transport car); *Mosso*, 2007 WL 2746723, at *1 (same). For example, in *Steiner*, the court agreed with the carrier's contention that attorney's fees were unavailable "in this suit regarding improper transportation of the [classic car]." *Steiner*, 2010 WL 11598069, at *2. And there was no indication in either case whether the carrier qualified as a household goods motor carrier, *see* 49 U.S.C. §§ 13501–13508 (concerning jurisdiction of motor carrier transportation), or a household goods freight forwarder service, *see id.* § 13531 (concerning jurisdiction of freight forwarder service), such that either was "providing transportation or service subject to jurisdiction under subchapter I or III of chapter 135 concerning the transportation of household goods by such carrier," *id.* § 14708(d).

Here, however, Kahn hired Bekins for an interstate household move. Before hiring Bekins, Kahn testified that he specifically asked Bekins whether it had the capability to transport his motorcycle as part of his move and that he hired Bekins based on its representation that Bekins "had the capability and experience to do that." Bekins does not contend that the motorcycle was excluded from the $50,000 limitation of liability or otherwise was treated differently than Kahn's household goods during the move.

19

Section 14708(d) does not require that the damaged item be a household good so long as the statutory requirements are met, including that the action "concern[s] the transportation of household goods by such carrier." Here, it is undisputed that Bekins is a household goods motor carrier under subchapter I of chapter 135, *see id.* §§ 13501–13508, and that Bekins was hired to transport Kahn's household goods. Because the statute does not also require that the item forming the basis for the claim be a household good, and because Bekins did not indicate in the bill of lading or any other documentation that it intended to treat Kahn's motorcycle differently than the other items in his household goods move, we cannot conclude that Kahn is precluded from an attorney's fees award under his Carmack Amendment claim based on Bekins' argument that the motorcycle itself is not a household good. *See Mid-Century Ins. Co. of Tex. v. Ademaj*, 243 S.W.3d 618, 621 (Tex. 2007) (noting that courts interpret statutes based on "their plain meaning," reading them "as a whole" and giving "effect to every part").

Because Kahn prevailed on his Carmack Amendment claim and established the statutory prerequisites under Section 14708(d), the trial court did not err by awarding him attorney's fees. *See, e.g.*, *Angelo v. Nation Relocation, Inc.*, No. 22-CV-04507-KAW, 2023 WL 8686901, at *7–8 (N.D. Cal. Oct. 20, 2023), *report and recommendation adopted*, No. 22-CV-04507-JST, 2023 WL 8696367 (N.D. Cal. Nov. 8, 2023) (awarding attorney's fees in default judgment on Carmack Amendment claim when plaintiff established statutory prerequisites under Section 14708(d)). We overrule Appellants' issue on this point.

### c. Willis' federal-preemption affirmative defense

Appellants argue that the Carmack Amendment to the Interstate Commerce Act, *see* 49 U.S.C. § 14706, preempts state-law claims, and thus the trial court erred in impliedly finding

Willis liable for negligence. "Congress intended for the Carmack Amendment to provide the exclusive cause of action for loss or damages to goods arising from the interstate transportation of those goods by a common carrier." *CEVA Logistics U.S., Inc. v. Acme Truck Line, Inc.*, No. 01-16-00482-CV, 2018 WL 6694606, at \*4 (Tex. App.—Houston [1st Dist.] Dec. 20, 2018, no pet.) (mem. op.) (quoting *Hoskins v. Bekins Van Lines*, 343 F.3d 769, 778 (5th Cir. 2003)). Its "preemptive scope . . . is 'sweeping.'" *Id.* (quoting *Tran Enters., LLC v. DHL Express (USA), Inc.*, 627 F.3d 1004, 1008 (5th Cir. 2010)).

Federal preemption is an affirmative defense, and the party asserting an affirmative defense carries the burden of proving it. *Christus Health v. Quality Infusion Care, Inc.*, 359 S.W.3d 719, 722 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see Mills v. Warner Lambert Co.*, 157 S.W.3d 424, 426 (Tex. 2005) (per curiam) (stating that federal preemption is ordinarily defense to plaintiff's suit but does not deprive state court of jurisdiction). Generally, "affirmative defenses must be properly raised in pretrial pleadings." *MAN Engines & Components, Inc. v. Shows*, 434 S.W.3d 132, 136 (Tex. 2014) (citing Tex. R. Civ. P. 94). This rule promotes "fairness" and serves to "give the opposing party notice of the defensive issue to be tried." *Id.* However, even if an affirmative defense is not properly raised in a pretrial pleading, it still may be preserved or tried by consent. *See Shoemake v. Fogel, Ltd.*, 826 S.W.2d 933, 937 (Tex. 1992) ("Rule 94's requirement of pleading is not absolute," including where defense "is apparent on the face of the petition and established as a matter of law."); *Big M Constr. Co. v. Machinery Transp., Inc.*, No. 12-00-00368-CV, 2001 WL 1153477, at \*2 (Tex. App.—Tyler Sept. 28, 2001, no pet.) (mem. op.) ("Trial by consent is intended to cover the exceptional case where it clearly appears from the record as a whole that the parties tried the unpleaded issue." (citing *Mastin v. Mastin*, 70 S.W.3d 148, 154 (Tex. App.—San Antonio 2001, no pet.))); *see also* Tex. R. Civ. P. 67 ("When

21

issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.").

Here, though the record establishes that Willis' registered agent was properly served with this lawsuit, Willis did not timely file an answer or enter an appearance until trial. Through joint counsel, Bekins and Willis filed "Defendants' First Amended Answer" during the one-day bench trial without seeking leave of court. *See* Tex. R. Civ. P. 63 (requiring parties to obtain leave of court to file pleadings within seven days of trial or thereafter); *Hinojosa Auto Body & Paint, Inc. v. Finishmaster, Inc.*, No. 03-08-00361-CV, 2008 WL 5210871, at *3 (Tex. App.— Austin Dec. 12, 2008, no pet.) (mem. op.) (discussing amended pleadings under Rule 63). That is, Willis did not properly raise its federal-preemption affirmative defense in a pretrial pleading. Willis likewise has not established that this is an "exceptional case" in which "it clearly appears from the record as a whole that the parties tried the unpleaded issue" by consent. *See Big M Constr.*, 2001 WL 1153477, at *2.

Further, we do not need to decide whether this case is one in which "Rule 94's requirement of pleading is not absolute" because those circumstances require both that the defense "is apparent on the face of the petition and established as a matter of law." *Shoemake*, 826 S.W.2d at 937. Even assuming the defense is apparent on the face of the petition, Willis cannot satisfy the latter requirement because it did not present evidence at trial to establish as a matter of law that the Carmack Amendment applies to it. *See* 49 U.S.C. § 14706(a)(1). At minimum, Willis did not present any evidence at trial that it is a "carrier" under the Carmack Amendment. *See id.* §§ 13102(3) ("The term 'carrier' means a motor carrier, a water carrier, and a freight forwarder."), 13102(14) ("The term 'motor carrier' means a person providing motor vehicle transportation for compensation."); *Vaughn v. United Parcel Serv. of Am., Inc.*,

No. 12-10-00272-CV, 2012 WL 2133594, at *3 (Tex. App.—Tyler June 13, 2012, no pet.) (mem. op.); *see also CEVA Logistics U.S.*, 2018 WL 6694606, at *4 (noting that Carmack Amendment applies to "carriers" but not "brokers" and that "[t]he difference between a carrier and a broker is often blurry"). For example, the bill of lading, which was admitted as an exhibit at trial, identifies Willis as the "Booking Agent" and "Origin Agent," but the bill of lading was issued by Bekins and outlines its contract terms as between Bekins and Kahn. Willis has not established as a matter of law that its federal preemption defense is apparent on the face of Kahn's petition and the Carmack Amendment preempts Kahn's negligence claim because it failed to present evidence that it is a carrier under the Carmack Amendment. *See* 49 U.S.C. § 14706(a)(1); *Arnold*, 2022 WL 2392875, at *7 (citing *Hoskins*, 343 F.3d at 778).

Willis failed to establish its federal-preemption affirmative defense as a matter of law. *See Shoemake*, 826 S.W.2d at 937. We overrule Appellants' issue on this point.

### III.     Whether sufficient evidence supports the challenged portions of the judgment

Finally, Appellants challenge the sufficiency of the evidence to support the negligence claim against Willis and the loss-of-use award.

#### a.   Willis' negligence

Appellants argue that there is insufficient evidence to support the negligence judgment against Willis in particular. To establish a negligence claim, a plaintiff must show (1) a legal duty owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) damages proximately caused by that breach. *Zenith Star Ins. v. Wilkerson*, 150 S.W.3d 525, 530 (Tex. App.—Austin 2004, no pet.). "Generally, an employer is liable for its employee's tort only when the tortious act falls within the scope of the employee's general authority in furtherance of the

23

employer's business and for the accomplishment of the object for which the employee was hired." *Affordable Power*, 347 S.W.3d at 831–32 (citing *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002)). And "as a general rule, an employer is insulated from liability for the tortious acts of its independent contractors." *Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 131 (Tex. 2018).

Viewing all evidence and inferences in their most favorable light to the trial court's finding, we cannot conclude that the negligence claim against Willis withstands a legal sufficiency challenge. *See Catalina,* 881 S.W.2d at 297. There was little evidence or testimony presented related to Willis in particular, and there is no evidence regarding the relationship between Willis and the mover who handled Kahn's motorcycle: whether the mover was an independent contractor, such that Willis would be insulated from his negligence, if any, or whether the mover was an employee, and if so, whether his actions fell within the scope of his authority, were in furtherance of the objective for which he was hired, or represented a deviation from the performance of his duties for his own purposes. *See Painter*, 561 S.W.3d at 131. When Burns was asked whether the person who loaded the motorcycle onto the truck worked for Willis, he stated that he "can't see [sic] definitively that they were an employee or contractor, but it would have been someone involved with or related to Willis Permian." Without more, this evidence is legally insufficient to establish that Willis in particular owed a duty to Kahn and then breached that duty. *See Wilkerson*, 150 S.W.3d at 530.

Because there is no evidence that Willis owed Kahn a duty and breached that duty, we sustain Appellants' issue on this point and reverse the trial court's judgment to the extent that it holds Willis liable for negligence.

### b. Loss-of-use damages

Finally, Appellants contend there is insufficient evidence to support the trial court's loss-of-use award of $29,228.99. Appellants maintain that "[r]easonable and fair minded people could not reach the conclusion that Dr. Kahn was deprived of an adequate substitute" because Kahn testified that he had access to two cars in the timeframe when he did not have a motorcycle. Appellants also argue that the loss-of-use award cannot withstand a sufficiency challenge because Kahn waited an unreasonable amount of time—over two years—to replace his motorcycle.[7]

Courts have "construed 'actual loss or damage' under the Carmack Amendment to include damages for delay, lost profits, and reasonably foreseeable consequential damages." *BINL*, 106 Fed. Cl. at 40 (citing *American Nat'l Fire Ins. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 931 (7th Cir. 2003)). In general, Texas permits loss-of-use damages in total-destruction-of-property cases. *J & D Towing, LLC v. American Alternative Ins.*, 478 S.W.3d 649, 676–77 (Tex. 2016). And to be entitled to loss-of-use damages, a plaintiff is not required to actually rent a replacement automobile or prove that he spent money on alternative transportation. *Jones v. Transportation & Parking Consultants, LLC*, No. 05-23-00355-CV, 2024 WL 1190525, at *3 (Tex. App.—Dallas Mar. 20, 2024, no pet.) (mem. op.) (citing *Luna v. North Star Dodge Sales, Inc.*, 667 S.W.2d 115, 118 (Tex. 1984)). However, there are limitations on this principle: "the damages claimed may not be 'too remote'" or "speculative," and "the evidence offered must rise above the level of pure conjecture." *J & D Towing*, 478 S.W.3d at 677. The Texas Supreme Court has also cautioned:

---

[7] Appellants do not challenge whether there is a legal basis to support this kind of award, stating that "[r]easonably foreseeable consequential damages are recoverable under the Carmack Amendment" and that Texas "allow[s] loss of use damages whether the property was totally destroyed or incapable of being repaired." Appellants also have not challenged the fact that the loss-of-use damages, when added to the damages for the replacement cost of Kahn's motorcycle, exceed the $50,000 liability limitation.

25

> Whether framed as a duty of mitigation or a doctrine of avoidable consequences, the principle is the same: A plaintiff may not recover loss-of-use damages for a period longer than that reasonably needed to replace the personal property. That principle compels a plaintiff's diligence in remedying his loss and deters an opportunistic plaintiff from dilly-dallying at the expense of the defendant.

*Id.*

Even assuming that loss-of-use damages like Kahn claims are recoverable under the Carmack Amendment, we agree with Appellants that there is insufficient evidence to support the award given the amount of time Kahn waited to replace his motorcycle and the corresponding "financial windfall" that awarding loss-of-use damages for this period creates. *See Dallas Performance, LLC v. Douglas*, No. 05-24-00131-CV, 2024 WL 5244640, at *5 (Tex. App.—Dallas Dec. 30, 2024, no pet.) (mem. op.) (reversing loss-of-use damages award following bench trial because "eight years is an unreasonably long period of time to mitigate [plaintiff's] damages," and loss-of-use award in addition to fair-market replacement value "resulted in a financial windfall"). Specifically, Kahn testified that in the "almost two years and four months" that he did not have a motorcycle, "I can't tell you how many times I looked out the window . . . and thought, I just wish I could get on that bike and be out in the world a little bit. It really would have helped my sanity, I think." And Kahn testified that he looked into renting a motorcycle but "couldn't find a Can-Am anywhere," only "Harleys" that rent for "about [$]140 to $230 a day," and nothing "that was $50 or less per day." But he provided no explanation for the length of time that it took him to replace the damaged motorcycle such that there was evidence from which the trial court could have inferred this delay was a reasonable length of time to remedy the loss and thus award loss-of-use damages in an amount equal to the replacement damages. *See id.*; *Jones*, 2024 WL 1190525, at *3 (determining trial court could have found fourteen days reasonable period on which to award

loss-of-use damages for damaged luxury vehicle but plaintiff's request for 180 days of loss-of-use damages would have resulted in "loss-of-use damages for an unreasonably long period of lost use" and "a windfall and excessive compensation for the injury done").

Further, Kahn presented no evidence that his previous use of the motorcycle "had been anything other than personal in nature . . . as opposed to pecuniary," and Kahn agreed that he had access to other vehicles during the period in which he did not have a motorcycle. *See Balderas-Ramirez v. Felder*, 537 S.W.3d 625, 638–40 (Tex. App.—Austin 2017, pet. denied) (determining plaintiff failed to raise fact issue as to entitlement to loss-of-use damages for over four-year period when she presented no evidence that her previous use of vehicle "had been anything other than personal in nature," and had access to other vehicle for roughly four years after accident); *see also Wolf v. Starr*, 617 S.W.3d 898, 907–08 (Tex. App.—El Paso 2020, no pet.) (finding evidence legally and factually insufficient to support jury's award for loss-of-use damages for motor home when, among other things, witness testimony indicated damages "revolved around being able to use the motor home to spend time with their grandchildren," which court found "more akin to mental anguish, rather than loss of value"). Kahn also provided no testimony that would support the amount of loss-of-use damages awarded, which totaled the exact amount of replacement value damages. *See Wolf*, 617 S.W.3d at 907 (reversing loss-of-use damages award when only witness who testified to loss-of-use damages "provided no basis for that figure"); *Balderas-Ramirez*, 537 S.W.3d at 636, 640 (determining plaintiff's "opinion" that average rental cost of similar vehicle in Travis County was $80 per day, among other things, insufficient to raise fact issue regarding entitlement to loss-of-use damages).

27

In sum, Kahn failed to present any evidence supporting loss-of-use damages during the over-two-year period following his move and before he replaced his motorcycle. We sustain Appellants' issue on this point.

## CONCLUSION

We reverse the trial court's judgment as to the $29,228.99 loss-of-use damages awarded and the negligence claim against Willis. Because there is no remaining claim against Willis by which Kahn could have recovered, we likewise reverse the trial court's judgment to the extent that it orders Kahn's actual-damages recovery "jointly and severally" against Bekins and Willis and render a take-nothing judgment as to Willis. Because the trial court awarded prejudgment interest on the loss-of-use damages award in the amount of $6,486.84, we likewise reverse that portion of the judgment. We render judgment that Kahn take nothing on his loss-of-use damages. We affirm the judgment in all other aspects.

_____

Rosa Lopez Theofanis, Justice

Before Justices Theofanis, Crump, and Ellis

Affirmed in Part; Reversed and Rendered in Part

Filed: May 22, 2025